Frank MANCUSO, Ellen Mancuso, individually and on behalf of their children, Deanna and Theresa Mancuso and F. Mancuso Boat Yard, Inc. d/b/a Echo Bay Marine, Plaintiffs,

v.

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Defendant.

No. 93 Civ. 0001(WCC).

United States District Court,
S.D. New York.

July 30, 1999.

As amended *nunc pro tunc*,
Aug. 13, 1999.

---

Crupain & Greenfield, New York City (Paul Greenfield, of counsel), for plaintiffs.

Charles E. McTiernan, Jr., Consolidated Edison Company of New York, Inc., New York City (Richard J. Giglio, of counsel), for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This is an action under the Clean Water Act, 33 U.S.C. § 1365, and under New York State law for personal injuries allegedly suffered by plaintiffs as a result of the contamination of soil and water at their former marina in New Rochelle, New York by polychlorinated biphenyls (PCBs) from the adjacent property formerly operated by defendant Consolidated Edison Company (ConEd) as an electrical power substation. After over six years of fitful prosecution, the action is before the Court again on ConEd's motion: (1) to exclude the proffered testimony of plaintiffs' latest medical expert that the various physical and mental illnesses allegedly suffered by plaintiffs were caused by, or at least are consistent with, exposure to PCBs; and (2) to dismiss the action with prejudice because plaintiffs, after ample opportunity, repeated warnings and extensions of time, are still unable to find any qualified expert who can express a scientifically acceptable opinion · that plaintiffs' claimed illnesses were caused by PCB exposure. For the reasons explained hereinafter, the motion is granted in both respects.

## BACKGROUND

### The Marina

Until 1987, plaintiff Frank Mancuso ("Mancuso") had worked as an automobile

mechanic and welder. Then, at the age of 40, in an admirable example of pursuit of the American Dream of running one's own business, he purchased the Echo Bay Marina from Robert Kolasch ("Kolasch"), giving Kolasch a mortgage-secured note for a major portion of the purchase price. The marina was a property of approximately 2 ½ acres including a large upland area containing several buildings and providing space for out-of-water boat maintenance and storage and docks extending into a narrow inlet from Echo Bay, as well as a small mud flat on the opposite side of the inlet adjoining the former ConEd substation. Mancuso ran the marina himself and Kolasch continued to work there as an employee for about six months.

Even before Mancuso purchased the marina, the water in Echo Bay was obviously contaminated heavily by oil spillage from an adjacent oil storage facility and pipeline terminal owned and operated by Shoreline Oil Company, Inc. ("Shoreline") and by runoff from a storm drain which extended from the nearby New England Thruway and which apparently had been tapped by other users so that, after every rain, not only large volumes of silt but also raw sewage with much floating debris were dumped into the Bay, giving it a filthy appearance and foul odor. As might be expected, this had a devastating effect on the business of the marina. However, according to Mancuso, it was not until after he had purchased the marina and operated it for some time that Kolasch told him that the marina was also contaminated by PCBs from the ConEd substation. The American Dream had become a nightmare.

As the business foundered, Mancuso struggled heroically to make the best of a bad deal. To reduce living expenses, he moved his family into the marina in the fall of 1988. They continued to live there for about four years in a metal building without kitchen or bathroom, cooking their meals on a hot plate, using a portable toilet that Mancuso emptied every second or third day and washing in a separate building fifty feet away that contained a shower provided for use by patrons of the marina (Exh. Q, pp. 1390–95).* To keep the inlet from silting up to the point where it was impassable for boats, Mancuso regularly borrowed the boat of one of the patrons, who was given free dockage space in exchange, tied it up in the channel and ran the engines at high speed in an attempt to stir up the silt and sweep it out into the Bay. In addition to such self-help measures, he repeatedly took recourse to the courts for relief.

**The Litigation**

Mancuso brought an action against Kolasch in New York State Supreme Court for recision of the purchase agreement on the ground of fraud. He also defended, on the same ground, the mortgage foreclosure suit brought against him by Kolasch.

Mancuso also brought three separate actions for contamination of the premises: this action, filed in January 1993, against ConEd for damages for contamination by PCBs; another action in this Court brought in March 1993 against the New York Thruway Authority for contamination by runoff from the storm drain; and a third action brought in January 1995 in New York Supreme Court, Westchester County, against Shoreline for the oil contamination. In each of the three actions, Mancuso attributed the financial failure of the marina to the particular contamination allegedly caused by the defendant in that case.

In the action against the Thruway Authority, Mancuso introduced evidence that runoff from the drain not only silted up the inlet to the point where boats frequently ran aground, but polluted the water with sewage including, according to his affidavit, such floating debris as hypodermic syr-

---

* "Exh." refers to the exhibits filed by ConEd in support of the motion; "Pl.Exh." refers to the exhibits filed by plaintiff in opposition.

inges, crack vials, condoms and sanitary napkins, so that it had the appearance of a "cesspool" and an "odor [that] can make you dizzy," making it all but impossible to attract and retain patrons, and ultimately destroying the business. Despite this evidence, the jury returned a verdict for the defendant, perhaps because they decided that the worst debris came not from the Thruway but from others who had surreptitiously tapped into the storm drain.

In the present action, Mancuso initially sought damages both for the injury to the property and the resulting destruction of the business and for personal injury to all the members of his family. ConEd moved for partial summary judgment dismissing the state law claim for property damage on the ground that it was barred by the applicable 3–year statute of limitations, N.Y.Civ.Prac.L. & R. § 214–c(2), and on December 12, 1994, Judge Vincent L. Broderick, to whom the case was then assigned, granted the motion. After Judge Broderick died and the action was reassigned to the present judge, Mancuso sought and obtained leave to file a belated motion for reconsideration. After extensive briefing, this Court on November 3, 1995 reaffirmed the dismissal of the state law claim as time-barred because Mancuso had learned of the claimed pollution of the property by PCBs in 1988, over·four years before the action was filed. 905 F.Supp. 1251.

Judge Broderick had referred the action to Magistrate Judge Mark D. Fox for the supervision of discovery and Judge Fox initially set December 31, 1995 as the deadline for completion of discovery After several extensions of this time, the Court set a trial date of May 26, 1997. But that date had to be adjourned because shortly theretofore ConEd made a motion in limine under *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to exclude the testimony of plaintiffs' designated expert witnesses, Dr. Howard Schwartz and Dr. Jeanne Dietrich. In a lengthy opinion dated July 2, 1997, reported at 967 F.Supp. 1437, this Court granted the motion as to Dr. Schwartz and denied it as to Dr. Dietrich. The Court excluded the testimony of Dr. Schwartz because he was not a toxicologist; had no training in environmental medicine or toxins; had no idea as to the level of PCB contamination of soil or water which would constitute a health hazard to persons exposed thereto—what is known as a "dose/response" relation; and no information as to the concentration of PCBs in the soil and water at Echo Bay marina. He did not take blood samples of the plaintiffs to ascertain even the presence, much less the level, of PCBs in their systems. He gave each of the plaintiffs a single, rather brief physical examination, relying entirely upon their medical histories and subjective complaints and what his visual inspection revealed, without objective tests of any kind. Shortly thereafter he rendered a written report in which he expressed the opinion that every one of their many and diverse symptoms of illness was caused by exposure to PCBs, a conclusion which was essentially *ipse dixit*, although ostensibly supported by citation of scientific literature not readily available to the Court, without attaching copies of the relevant portions of such publications or even quoting from them.

Moreover, these authorities were purportedly relied on as establishing nothing more than that PCBs can cause certain illnesses in humans—known in toxicology as "general causation." Dr. Schwartz had no reasonable basis for concluding that PCBs caused such illnesses in these particular plaintiffs—known as "specific causation"—because he did not rule out or apparently even consider the possibility that their illnesses could have resulted from other causes, and thus could not make the required "differential diagnosis." He thus totally ignored the methodology prescribed by both the World Health Organization (WHO) and the National Academy of Sciences (NAS) for determining whether a person has been adversely affected by a

toxin. See Federal Judicial Center: Reference Manual on Scientific Evidence, "Reference Guide on Toxicology," at 185 ("Reference Manual").

Although the Court excluded the testimony of Dr. Schwartz, it declined to grant summary judgment in favor of ConEd at that time, stating

> We will allow plaintiffs a brief period to find a qualified expert and submit an adequate Rule 26(a)(2)(B) report. However, our patience is not unlimited. In October of 1994, Magistrate Judge Fox warned plaintiffs that they had 20 days to provide expert reports "sufficient in accordance with the rule" and that "if they're not sufficient you're facing preclusion." ... Unless plaintiffs submit within 45 days an expert's report complying with rule 26(a)(2)(B), or show good cause why they need additional time to do so, their complaint will be dismissed with prejudice.

> Plaintiffs are cautioned that this report must be rendered by an expert who has knowledge and experience in the medical effects of PCB exposure and who follows accepted toxicological methods. If the Mancusos wish to avoid yet another, and final, exclusion by this Court, the report must discuss the literature that supports the expert's conclusions and include copies of the relevant portions of such literature.

967 F.Supp. at 1457.

Although the Court did not exclude the proffered testimony of Dr. Dietrich that the Mancusos' younger daughter, Theresa, had a learning disability (which Dr. Schwartz attributed to PCB exposure), the Court added:

> There is a caveat, however. Dr. Dietrich will not be allowed to testify that PCBs caused the ailments she diagnoses in Theresa. Dr. Dietrich is not a medical doctor, much less an expert on the effects of exposure to PCBs. We decline at this point to reach the question of whether the literature shows that PCBs can cause learning disabilities, since we

> have excluded the testimony of plaintiffs' proffered expert on causation. If plaintiffs cannot produce a qualified expert to testify that PCBs cause learning disabilities, Dr. Dietrich's testimony will be excluded as irrelevant.

967 F.Supp. at 1456–57.

**The Baturay Report**

After seeking and obtaining an extension of the time for serving and filing the report of a medical expert on causation, plaintiffs on September 30, 1997 designated Dr. Nesrine Baturay, an Associate Professor in the Department of Pharmaceutical Sciences at St. John's University, as their medical expert. On November 20, 1997, Dr. Baturay issued a nine-page report stating her opinion and the basis therefor.

Dr. Baturay began her report by stating that she is "a Medical Doctor licensed to practice in the State of New York." However, as ConEd has pointed out, after completing medical school, Dr. Baturay did not perform an internship or residency and accordingly was never licensed to practice medicine and has never diagnosed, treated or given medical advice to patients. Moreover, she has no formal training or experience with respect to PCBs and their effects on persons exposed to them. Indeed, she testified that until she was contacted by plaintiffs' attorney, "I really did not know anything about [PCBs] and I thought it would be a nice thing to learn" (Exh. C, p. 298). Her knowledge of PCBs was derived from reviewing medical literature during the next three months.

She obtained the factual information on which her opinion was based from: (1) a visit to the Echo Bay marina; (2) the report of Technion, Inc. ("Technion") on its PCB assay of soil samples taken from four points in the marina area; (3) the reports of Dr. Jesse H. Bidanset and Dr. Ian Webber on the effects of PCB exposure on humans; (4) an interview and physical examination of each of the four members of

Mancuso's family; and (5) laboratory tests which she conducted to ascertain (a) the effect on mouse and hamster cells of exposure to extracts of soil samples taken from the marina and (b) the condition of cells taken from the Mancuso family members.

Dr. Baturay's physical examination of the plaintiffs did not include having them disrobe so that she could examine any skin areas normally covered by clothing. Nor did she take any blood samples or conduct any other clinical tests or objective investigation, but based her opinion on only what was visually apparent plus plaintiffs' medical histories and subjective complaints. These complaints included:

Frank Mancuso: toxic burns, rashes, productive pustules, headaches, fatigue, loss of eye sight, hair loss, skin eruptions, mental and emotional fear, anxiety

Ellen Mancuso (wife): rashes, fatigue, painful joints, vomiting, bloody noses, irregular cycles, mental and emotional anxiety, fear, and other emotional damage

Deanna Mancuso (daughter, born 1982): rashes, facial flare-ups and swelling, respiratory impairment, persistent sneezing, cold-like symptoms, productive pustules, embarrassment, fear, anxiety, psychological injury and distress

Theresa (daughter, born 1990): fused teeth, rashes, jaundice at birth, learning disability/attention deficit disorder, inexplicable outbursts of frustration/rage (Exh. B, p. 6).

In her first set of laboratory tests, Dr. Baturay cultured cells taken from mouse embryos and hamsters, dosed some of them with extracts of sediment samples from the marina and observed the cell foci after a six-week incubation period. She found that the cells so dosed had an elevated number of "transformed" foci. She took samples of these, stained them to distinguish between different chromatids and examined and counted the altered chromosomes microscopically. From this analysis, she concluded that chromosomal transformations (sister chromatid ex-

changes or SCEs) had been induced in the cells by exposure to PCBs. In her second experiment, she took biopsy specimens from each of the plaintiffs, cultured them and subjected them to similar chromosomal analysis. From this she concluded that the cells of each of the plaintiffs exhibited chromosomal transformations similar to those exhibited by the mouse and hamster cells exposed to extracts of sediment samples from the marina.

On the basis of this analysis, she expressed the opinion that "The Mancuso's medical complaints and symptoms, more fully described [above], were caused by exposure to toxic doses of PCB's and dioxins" (Exh. B, p. 3, ¶ B). More specifically she added: "In my opinion the skin rashes suffered by each of the family members can only reasonably be associated with toxic exposure to PCB's" (*Id.*, p. 7, ¶ 10). With reference to Theresa, "her neurological condition, as diagnosed by Dr. Dietrich and Dr. Roseman, is consistent with current scientific and medical literature associating this type of damage with toxic exposure to PCB's." (*Id.*, p. 7, ¶ 11.) She thus concluded that "[t]he laboratory tests demonstrate that the Mancuso's cells have been permanently damaged by toxic exposure to PCB's in a way that is transferred to daughter cells which divide in response to injury. Therefore the Mancusos … have a rational fear and anxiety [about cancer] as a result of this toxic exposure." (*Id.*, pp. 8–9, ¶ 12.)

ConEd opposes the Court's acceptance of Dr. Baturay's report because there was no effort to comply with the Court's directions that the report "must be rendered by an expert who has knowledge and experience in the medical effects of PCB exposure and who follows accepted toxicological methods … [and] … must discuss the literature that supports the expert's conclusions and include copies of the relevant portions of such literature." 967 F.Supp. at 1457. ConEd contends that Dr. Baturay had no prior experience in this field,

and no knowledge other than that which she gained in a brief review of the literature; that her report revealed a gross misunderstanding of several critical matters including the average concentration of PCBs in the blood of the general population and the dosage of PCBs which will produce a toxic response; that she did not determine or know the level of PCBs in the blood of any of the plaintiffs; that she did not follow an accepted toxicological method such as that prescribed by WHO and NAS, and recommended in the Reference Manual; that she made no significant effort to rule out other potential causes of plaintiffs' symptoms; and that, although she attached as Exhibit Three to her report an 11–page list of 180 "Medical and Scientific References," she did not refer to even a single one of them in her report, much less quote from them and attach copies of the relevant portions, as directed by the Court's Opinion and Order of July 2, 1997. On January 8, 1998, Dr. Baturay submitted a 13–page Supplemental Report in which she listed 150 other medical and scientific publications which she claimed supported her methodology, but again without specifically referring to any of them in her report, or quoting from any of them, much less attaching copies of the relevant portions.

After extensive depositions of the experts, on April 29, 1999 ConEd filed the present motion to preclude the testimony of Dr. Baturay and for summary judgment, filing in support thereof, inter alia, reports of its own experts, Dr. Raymond Harbison and Dr. David E. Cohen, challenging Dr. Baturay's methodology and conclusions in virtually every respect. The final briefs on the motion were filed June 8, 1999. Because, after many adjournments, the action is set for trial on September 27, 1999, the Court has given expedited consideration to the motion.

## DISCUSSION

### Applicable Legal Principles

Until the Supreme Court's decision in *Daubert*, the admissibility of expert testimony had traditionally been determined by the rule of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), requiring that an expert's opinion be based on a scientific principle which has "gained general acceptance in the particular field in which it belongs." *Id.* at 1014. In *Daubert*, the Court ruled that the *Frye* test had been superseded by the more inclusive Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Court cautioned that the displacement of the *Frye* test by Rule 702 "does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence.... To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786. The Court explained that the use of the word "scientific" in Rule 702 "implies a grounding in the methods and procedures of science" and the use of the word "knowledge" connotes "more than subjective belief or unsupported speculation." *Id.* at 590, 113 S.Ct. 2786. Thus the Court concluded that

> in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability. *Id.*

The Court added that this "entails a preliminary assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786. Finally, the Court counseled that trial courts must be careful not to usurp the role of the jury: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596, 113 S.Ct. 2786.

The Second Circuit reiterated this instruction in *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1045 (2d Cir.1995), and cautioned against "unwarranted expansion of the gatekeeper role" that would elevate judges to "the role of St. Peter at the gates of heaven . . . separating the saved from the damned . . . [which] would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury." The Third Circuit has likewise instructed trial courts not to exclude opinion testimony on the basis of an "impermissible jury-like determination that it preferred the defendants' expert opinion to that of [plaintiffs' expert]." *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 733 (3d Cir.1994).

We will now seek to apply these principles to the proffered testimony of Dr. Baturay.

## Plaintiffs' Search for an Expert

Plaintiffs have had considerable difficulty in finding a medical expert who would support their claim of injury due to PCB exposure. None of the eight treating physicians or consulting specialists who examined them and diagnosed their complaints attributed any illness to such a cause. Plaintiffs' attorney accordingly looked for a non-treating medical expert and found a truly qualified specialist, Dr. Arnold Schecter, an eminent toxicologist and expert on the effects of PCB exposure, editor of the treatise *Toxicology* and author of *Dioxins and Health,* and designated him as their sole medical expert. He sent plaintiffs for a blood test which revealed that the levels of PCBs in their blood were actually lower than those in the blood of average Americans living in urban areas. When ConEd took his deposition in 1994, he indicated that he could not say that any of the plaintiffs had illnesses caused by exposure to PCBs. Although he said that the skin rashes "could well be" caused by PCBs, he conceded that they also "can be from any causes" (Transcript at 110).

Not surprisingly, plaintiffs promptly dropped Dr. Schecter as their medical expert and looked for another. They found Dr. Howard Schwartz, a general practitioner who, as previously discussed, had no prior knowledge of PCBs whatever, but who, on the basis of a brief physical examination of plaintiffs, and without tests of any kind, promptly rendered the opinion that every one of their complaints, from post-nasal drip and male hair loss to mental retardation, was caused by exposure to PCBs. The Court's decision precluding his testimony to that effect was not a close call.

Plaintiffs renewed their search for a medical expert and located Dr. Nesrine Baturay.

## Dr. Baturay's Qualifications

As previously mentioned, Dr. Baturay is an Associate Professor in the Department of Pharmaceutical Sciences at St. John's University. She is not licensed to practice medicine and has never examined, diagnosed, treated or advised patients. She had no knowledge of PCBs whatever prior to being approached by plaintiffs' counsel in August 1997. After only three months, in November 1997, she felt sufficiently qualified to render the opinion that all of the plaintiffs' diverse illnesses and complaints were caused by exposure to PCBs. However, when her deposition was taken in April 1998, her testimony revealed serious gaps in her knowledge of PCBs. For

example, she admitted that she had "no idea" of the "background level" of PCBs in human blood (the average level in the general population) (Exh. C, p. 69). Indeed, she said that she thought that average persons did not have any PCBs in their blood (*Id.* at 199). Thus, when she rendered her report, she had no idea how the plaintiffs' blood PCB levels compared to those of the general population. By the time of a later deposition, she had formed an understanding as to the background level of blood PCBs, but it was wildly inaccurate. She testified that she believed that the average American has 41 parts per *trillion* (ppt) PCBs in his blood (p. 355), whereas plaintiffs' own expert, Dr. Schecter, said that the average is 4–10 parts per *billion* (ppb). Dr. Baturay was off by a ratio of 100:1. Thus there is ample reason to be skeptical of any opinion she might render as to whether plaintiffs' symptoms were caused by PCB exposure.

A number of courts have excluded the opinion testimony of medical experts who lacked specialized knowledge or experience in the particular branch of medicine involved in the litigation. For example, in *O'Conner v. Commonwealth Edison Co.*, 13 F.3d, 1090, 1107 & n. 19 (7th Cir.1994), the Seventh Circuit affirmed the district court's exclusion of the testimony of plaintiff's expert that plaintiff's cataracts were caused by radiation because the proposed witness had treated only five cases of radiation-induced cataracts in twenty years, stating, "We do not believe this limited exposure ... qualifies as a basis for a scientifically sound opinion." And in *Chikovsky v. Ortho Pharm. Corp.*, 832 F.Supp. 341, 344–46 (S.D.Fla.1993), the court excluded the testimony of plaintiff's expert that Retin–A caused the birth anomalies of plaintiff's child because the expert, although an obstetrician-gynecologist, had no specialized training in embryology or teratology and could not rule out other possible causes of the anomalies. In both of those cases, the proffered expert appeared to have much better qualifications in the relevant specialty than Dr. Baturay

has in this case. However, in another case which, like the instant case, involved toxicology, the court ruled that even though the proffered expert was not a toxicologist, his testimony might be admissible if he properly employed accepted principles and methods of that specialty. *Cavallo v. Star Enter.*, 892 F.Supp. 756, 771 (E.D.Va.), *aff'd in relevant part*, 100 F.3d 1150, 1159 (4th Cir.1996).

### Dr. Baturay's Methodology.

The methodology for determining whether a person's illness was caused by a specific toxin, as prescribed by WHO and NAS, and recommended by the Reference Manual, is a three-step procedure: First, the level of exposure of plaintiff to the toxin in question must be determined; second, from a review of the scientific literature, it must be established that the toxin is capable of producing plaintiff's illness—called "general causation"—and the dose/response relationship between the toxin and the illness—that is, the level of exposure which will produce such an illness—must be ascertained; and third, "specific causation" must be established by demonstrating the probability that the toxin caused this particular plaintiff's illness, which involves weighing the possibility of other causes of the illness—a so-called "differential diagnosis."

In this case, Dr. Baturay's methodology was flawed at every one of the three stages.

### Step 1: Plaintiffs' Exposure

Dr. Baturay's information concerning the extent of plaintiffs' contacts with the soil and water of the marina naturally came from the plaintiffs themselves and they had a strong incentive to exaggerate those contacts. Dr. Baturay's report does not discuss any specific conclusion she reached as to the extent of such contacts, but in her deposition she testified that, in forming her opinion, she had assumed that, "except when it was wintertime and cold," plaintiffs went into the water and the mud "on pretty much a daily basis"

(Exhibit C, p. 432). The falsity of that assumption was established by plaintiffs' own testimony. Mancuso's wife Ellen testified that she worked full-time as a sales clerk at Macy's up to the birth of Theresa in June 1990, although she helped out part-time at the marina, answering the telephone and tying boats up at the dock, neither of which activities would appear to involve significant contact with the water or mud (Transcript at 7–8). Considering plaintiffs' own descriptions of the foul appearance and smell of the water, it would be surprising if they did not do their best to avoid or minimize contact with it. Indeed, Ellen Mancuso's brother, Brian Ehlers, who worked at the marina full-time from 1989 to 1992, testified that he never went in the water and that the Mancuso children "absolutely" never swam there because Ellen "wouldn't let them go in the water" (Trans. at 8). And Ellen Mancuso testified that she may have been in the water two times in 1988 and never thereafter (Exh. N, p. 27). Thus Dr. Baturay's analysis began with a false assumption which seriously undercuts the basis for her conclusions.

The record undisputedly shows that in 1981 there was a transformer fire at the Echo Avenue substation, causing a substantial quantity of oil containing PCBs to be spilled from the transformer into the surrounding transformer moat. After testing the substation soil, the New York State Department of Environmental Conservation (DEC) ordered a cleanup, resulting in the closure of the substation. However, there is a sharp disagreement as to the extent which this oil spillage at the substation resulted in PCB contamination of the soil and water of the nearby marina. In September 1997, Technion tested four samples of silt/sediment which Dr. Baturay took from the marina's mud flat and from the bottom of the inlet at low tide and found total PCB concentrations of 30.07, 31.85, 44.54 and 74.76 parts per million (ppm), respectively (Pl.Exh.Q).

These levels are suspect because they are substantially higher than those found in many other tests. In another 1995 test, Lawler, Matusky & Skelly Engineers assayed 48 samples of sediment from the mud flat; 34 had PCB levels below 1.0 ppm, and only one had a level above 1.37 ppm (Exh. OO, p. 3). In December 1993, plaintiffs' own expert, Dr. Ian Webber, tested nine samples taken from the mud flat and from sediment in the basin and found PCB concentrations ranging from a low of 3.46 ppm to a high of 7.31 ppm (Pl.Exh.L, p. 13). From February to April 1993, Matrix Environmental Management tested nine samples taken from various areas of the marina; four contained no detectable levels of PCBs while the other five all had levels below 0.25 ppm (Exh. O, pp. 3–5). In 1991, Materials and Environmental Technologies tested twelve sediment samples from the marina and found that eleven had PCB levels below 1 ppm, while one had 1.85 ppm (*Id.* at 2). Thus, of the 82 samples tested, most had PCB levels below 1.0 ppm; only nine had levels above 2 ppm, and eight of those were taken by plaintiffs' experts.

The significance of these figures can be judged by the fact that the U.S. Environmental Protection Administration (EPA) permits PCB levels in soil of up to 50 ppm in industrial areas and up to 10 ppm in residential areas (40 C.F.R. § 761.125(c)(2)(ii)). The New York DEC ordered the soil at the substation cleaned up to a level of 1 ppm, while allowing up to 5 ppm in the sediment in the bay. It set the higher level for the sediment for the stated reason that "PCBs are probably well bound to the highly organic soil in the marsh. Hence it is not readily bioavailable." (Exh. B to prior motion.) From this comparison, it appears that the levels of PCBs, even in the mud flat and in the sediment of the marina, where the highest concentrations would be expected because of the affinity of PCBs for highly organic matter, are generally much lower than those that are deemed to create no unacceptable health risks even to persons in

intimate contact with the soil. Because the upland areas of the marina where plaintiffs lived were found not to be contaminated with any measurable quantities of PCBs (Exh. O) and because plaintiffs deliberately avoided contact with the water and thus the underlying sediment, it is clear that Dr. Baturay's estimate of their exposure to PCBs was grossly excessive..

Perhaps realizing the unlikelihood of proving that plaintiffs were exposed to toxic levels of PCBs, Dr. Baturay repeatedly refers to a toxic combination of "PCB's and Dioxins." Dioxins, or polychlorinated dibenzodioxins, are much more toxic than PCBs—according to Dr. Baturay, roughly one thousand times more toxic (Exh. B, p. 5, ¶ 8). Dioxins can be produced when PCBs are oxidized by combustion or incineration. Plaintiffs contend that dioxins were produced by the transformer fire at the substation. But in most of the tests of soil samples from the marina, no dioxins were found. In one test, conducted by Wellington Laboratories in 1995, two sediment samples from the mud flat were found to have dioxin equivalent levels of 2.5 parts per *billion* (ppb), which is far below the suggested cleanup levels of 20 ppb of dioxin for residential areas and 131 ppb for industrial areas (DX OO, p. 5). Thus, Dr. Harbison stated unequivocally that the dioxin levels at the marina "do not represent a risk to human health." (*Id.*)

Clearly the most reliable way of determining the doses of PCBs which plaintiffs absorbed would be to test the PCB levels in their blood. Plaintiffs' original medical expert, Dr. Schecter, therefore sent samples of plaintiffs' blood to Dr. Mary Wolff, for analysis in July 1994. Dr. Wolff determined that plaintiffs' blood had PCB levels of 3.8, 3.4, 1.9 and 3.7 ppb, respectively (Exh. FF to prior motion). Dr. Schecter testified that the typical blood PCB level for adults in New York is 4–10 ppb, and that his own level is 10–11 ppb. He attributed this higher number to his diet (for example, fish tend to have relatively high levels of PCBs) and to his age, since PCBs accumulate in the blood over time (Schecter Dep., at 38). Thus, at the time of testing, all of the plaintiffs had blood PCB levels well below average. This finding undoubtedly was an important factor in Dr. Schecter's failure to attribute any of plaintiffs' claimed ailments to PCB exposure and in his replacement as plaintiffs' medical expert.

The results of Dr. Wolff's tests of plaintiffs' blood PCB levels were consistent with those conducted two years earlier in October 1992 at Roche Biomedical Labs. In that test, the lower detection limit was 5 ppb. The blood of none of the plaintiffs contained detectable levels of PCBs, indicating that all of the plaintiffs had blood PCB levels below 5 ppb (Exh. OO, p. 6).

Plaintiffs challenge the significance of all the tests of plaintiffs' blood by arguing that "[e]levated traces of PCB are absent from blood no later than six months after exposure on a chronic basis." (Pl.Mem., p. 9.) More specifically, plaintiffs add that "Dr. Schecter repeatedly expressed the well-founded opinion that PCBs leave a person's blood stream within six months after exposure." (*Id.*) In support of these statements, plaintiffs cite a number of pages of the transcript of Dr. Schecter's deposition testimony and attach copies of all these pages as Exhibit B to their memorandum. However, a careful reading of those pages reveals that Dr. Schecter's testimony does not supply a basis for plaintiffs' representations. The most relevant testimony of Dr. Schecter was this statement:

... what we found and others have found is that the PCB level will go up in the blood after some exposures, *some point-type exposures, not long, chronic exposures,* and then it will come down. So, a few months later there may be a baseline effect and the levels may jump. Whether they are below the average, in the average range, or above the average, after exposure frequently the levels of blood PCBs will go up and then come down within days or weeks or months

and then stay at a steady level from that point on.

(Pl.Exh. B, p. 41, emphasis added.) Thus, Dr. Schecter was at pains to make it clear that he was talking about brief "point-type" exposures, not long, chronic exposures of the type that would occur in a contaminated residence or workplace. In none of his other testimony in Exhibit B did Dr. Schecter make any estimate as to the length of time PCBs would remain in the blood stream after long-term exposure, and he never mentioned a term of six months in any context.

ConEd submitted a report of its expert, Dr. Raymond D. Harbison, a professor of Toxicology in the Department of Environmental and Occupational Health at the University of South Florida and technical consultant to the EPA who, with supporting quotations from many medical texts, stated "with a reasonable degree of scientific certainty" that the half life for PCBs in the Mancusos' blood "would be approximately 3–4 years." (Exh. OO, p. 7.) Thus he concluded that, because the PCB levels in the blood of all the plaintiffs were less than 5 ppb in 1992, the *maximum* level of blood PCBs that they could have had when they moved from the marina in 1991 (1/4 to ⅓ of a half life earlier) is less than 6.5 ppb, which is less than the background level in the general urban population. *Id.*

Plaintiffs further argue that Dr. Schecter "was clear that blood testing was not significant in diagnosing a chronic exposure, after the fact," citing pages 51 and 52 of Dr. Schecter's deposition (PI Mem., pp. 9–10). On the cited pages of the transcript, Dr. Schecter said nothing to indicate that blood testing was "not significant." He merely stated that in many cases, the toxicologist was not "lucky" enough to find any identifiable toxin in the patient's blood, in which event he would have to rely on an environmental assessment and a medical history to ascertain the cause of the patient's illness. But elsewhere in his testimony he listed blood tests among the investigative tools which a toxicologist would use in determining whether a patient has been exposed to toxic levels of PCBs:

> You would again go back to the basics of occupational medical history or environmental history. You would take a history of what chemicals were present, what the levels were, how the exposure would occur, and then when the symptoms started and then when the symptoms ended (*Id.* at 113) ... and whether there were "other likely causes" (*Id.* at 126). You would also have to conduct "[a]ppropriate laboratory tests, including complete blood count with differential, serum chemistries, serial blood PCB determinations, fat biopsy to estimate furan and dioxin levels, if indicated, pulmonary function tests, chest x-rays, urinalysis including porphyrin measurement...." (Pl.Exh.B, p. 69–70). So, using blood PCB tests is just one tool in a medical armamentarium. Like a heart attack, you take [an] electrocardiogram, you do a history. You put the whole picture together (*Id* at 41).

Whatever the precise PCB concentration in the sediment of the marina might be, because Dr. Baturay was misinformed about the extent of plaintiffs' actual contact with the sediment, she had no basis for making even a rough approximation of the extent of their exposure to PCBs. Instead, as her report makes clear, because the plaintiffs were suffering illnesses which she believed could have been caused by PCBs, and because she found no other apparent causes, she merely assumed that they must have been exposed to toxic doses of PCBs (Exh. B, p. 4, ¶ 7). As courts have recognized, it is improper for an expert thus to assume that the plaintiff "must somehow have been exposed to a high enough dose to exceed the threshold [necessary to cause the patient's illness], thereby justifying his initial diagnosis. This is circular reasoning." *O'Conner v. Commonwealth Edison Co.,* 807 F.Supp. 1376, 1396 (C.D.Ill.), *aff'd,* 13 F.3d 1090 (7th Cir.1994).

### Step 2: General Causation

A fundamental tenet of toxicology is that the "dose makes the poison" and that all chemical agents, including water, are harmful if consumed in large quantities, while even the most toxic substances are harmless in minute quantities. *See* Reference Manual, at 185. Therefore, in determining whether plaintiffs' exposure to PCBs could have caused any illnesses that they have, it is necessary to establish the dose/response relationship between PCBs and those particular illnesses.

PCBs have long been suspected as a possible cause of cancer, but a number of studies of those working in capacitor factories in direct contact with dielectric oils containing PCBs failed to establish a statistical increase in cancer fatalities above the standard mortality ratio. Thus the EPA currently classifies PCBs as B2 carcinogens, which means that there is inadequate evidence they cause cancer in humans (Exh. OO, pp. 16–19).

Dr. Baturay's laboratory tests were designed to show that exposure of animal cells to extracts of mud taken from the marina caused a type of chromosomal transformation—sister chromatid exchanges (SCEs)—which could cause uncontrolled cell division and thus lead to cancer, and that cells taken from the plaintiffs had undergone a similar chromosomal transformation.

In an extensive report (Exh. BB), ConEd's pharmacological expert, Dr. Harbison, who participated in promulgating toxicity testing procedures for the NAS, convincingly pointed out many flaws in Dr. Baturay's tests. He explained that it is generally understood that the results of such *in vitro* tests of chromosome transformation, in which the cells are bathed in the test solution, cannot be reliably extrapolated to predict cell effects *in vivo*, where the toxin reaches the cells indirectly through the blood stream and where the body creates its own natural defenses against toxins, by repairing breaks in the DNA strands and otherwise (Exh. BB, pp. 20–28). In her tests employing animal cells, Dr. Baturay used 3T3 mouse and CHO Chinese hamster cells which had been manipulated to reproduce continually in a culture (immortalized), as contrasted with normal human cells which die under similar conditions. This makes these special cells particularly susceptible to transformation, so that they will provide a sensitive means of screening for toxicity. But it also makes them highly susceptible to uncontrolled cell division, the distinguishing characteristic of cancer (*Id.* at 32).

In her tests involving cells taken from the plaintiffs, Dr. Baturay did not use a proper control—that is, cells of comparable subjects who had not been exposed to mud from the marina. Instead, for her control she used samples of foreskin, presumably from infants, leaving open a substantial possibility that the chromosomal changes she detected were due to factors other than toxic exposure, such as aging, which is "one of the primary factors" affecting SCEs (*Id.* at 29). As Dr. Harbison explained, in the normal process of cell replication, the chromosomes split, with their two component spiral filaments or chromatids, going to different poles of the dividing cell. Occasionally there is an exchange of DNA segments between the two sister chromatids, which may occur spontaneously or as a result of chemical insult. Many chemicals have been associated with increased proportions of SCEs, including petroleum products of the type known to be present in the marina. As a person ages, these SCEs accumulate in the body. Therefore a mere count of SCEs in a person's tissue is useless without a proper control for comparison. "Demonstrating differences in the sister chromatid frequency between a man in his 40's and reference foreskin cells is not meaningful and does not substantiate particular suggested causes (i.e., PCBs in sediment) as the basis for the accumulated sister chromatid exchanges." (*Id.* at 29.)

Dr. Baturay also conducted cytotoxicity tests with variously diluted solutions of extracts from the marina sediments to determine which concentrations of PCBs are cytotoxic to 3T3 mouse cells and CHO hamster cells—that is, which will kill such cells. Apparently due to an error in computing the ratio of dilution of the test solutions, she concluded that PCB concentrations as low as 0.1 ppb (one part in ten billion) are cytotoxic. The absurdity of this conclusion can be appreciated by comparing it to the average "background" blood PCB levels of 4–10 ppb, or *forty to one hundred times* the level of toxicity determined by Dr. Baturay. If Dr. Baturay's conclusion were correct, the blood cells themselves could not be replenished, nor could any of the body cells contacted by the blood. Many of us would have died long ago (*Id.* at 30–31).

Moreover, even if Dr. Baturay's tests had been flawlessly performed and the results correctly interpreted and appropriately extrapolated, which they clearly were not, all they would show is that exposure to extracts of mud from the marina causes chromosomal changes capable of leading to cancer. But none of these plaintiffs has developed any detectable cancer, even though their life at the marina began over a decade ago and ended seven years ago. Dr. Baturay does not even attempt to show that the chromosomal changes are associated with any illnesses that plaintiffs are actually suffering. This is not surprising since Dr. Harbison categorically states that there are no published studies establishing a causal relation between PCBs and any of plaintiffs' other claimed illnesses (Exh. OO, pp. 8–20).

In the section of their memorandum entitled "Dr. Baturay Established a Dose Response Level," plaintiffs begin by stating that the DEC "mandated a clean-up to one part per million of PCBs at the property." (Pl.Mem., p. 21.) It is true, as previously noted, that, after the spill of transformer oil containing PCBs, the DEC required ConEd to clean up the soil at the

substation to a level of 1 ppm. However, as also noted, the DEC directed clean-up only to a PCB level of 5 ppm in the sediment of Echo Bay, and the EPA allows PCB levels of up to 10 ppm in residential areas and 50 ppm in industrial areas. In tests of over fifty samples of mud and silt taken from the marina, virtually all showed PCB levels well below 50 ppm, and most showed PCB levels of less than 1 ppm.

Plaintiffs continue by arguing that *"Dr. Baturay found that 4 parts per billion or more were the dose effect she was dealing with...."* (Pl.Mem., p. 22, emphasis in original.) At page 12 of the same Memorandum, plaintiffs state, "Specifically, at page 8 of her supplemental report [Pl.Exh. J] ... Dr. Baturay found that the toxic dose of the PCB found at the site is less than four parts per billion...." However a reading of page 8 of Dr. Baturay's supplemental report (Pl.Exh.J) shows that what she actually said is that "the toxic dose of the PCB's found at the site is less than .4 ppb ..." (emphasis added)—in other words, less than four parts in *ten* billion. Thus, the level of PCBs which Dr. Baturay found to be toxic was less than *one ten-thousandth* as high as the level which the DEC and EPA have found to be safe. With such a monstrous error in computing the toxic dosage, it is no wonder that Dr. Baturay concluded that plaintiffs were exposed to toxic doses of PCBs at the marina. Indeed, if she were correct, all of us would also have been so exposed, because the background level of PCBs everywhere around us is *ten thousand times* her computed level of toxicity.

More significantly, nothing in this section, or indeed any other section, of plaintiffs' memorandum, discusses the dose/response relation between PCBs and any illnesses plaintiffs are actually suffering— that is, the dose necessary to cause those particular illnesses. This is information which would normally be derived from a review of the medical literature. Although Dr. Baturay appends to her two reports a list of some 330 technical publications, she

does not quote or even refer to a single one of them. She surely knows that the Court does not have ready access to these publications nor the time to go to a medical library and study all of them. That is why the Court, in its Opinion and Order of July 2, 1997, directed that any new expert report "must discuss the literature that supports the expert's conclusions and include copies of the relevant portions of such literature." 967 F.Supp. at 1457. Dr. Baturay's total disregard of that direction tends to reinforce Dr. Harbison's statement that there is no such supporting literature.

Dr. Baturay did not come close to establishing a credible dose-reponse relationship, even for cancer, much less for any illnesses actually suffered by plaintiffs.

Plaintiffs attempted to fill in this gap in Dr. Baturay's methodology not by the customary reliance on published studies of the levels of PCB exposure necessary to cause specific illnesses but by submitting a lengthy report of Dr. Ian Webber (Pl.Exh. L). Dr. Webber presented his own calculation of the level of PCBs in sediment which would cause cancer in persons exposed thereto. He did this through a complex computation in which he worked backward, beginning with an assumed "acceptable dose," or AD, of PCBs which, received daily over a period of one year, would produce a "risk factor" of $10-6$ (one chance in a million of causing cancer), and attempting to compute the concentration of PCBs in mud which would result in the intake of such a dose, which Dr. Webber referred to as the maximum acceptable soil concentration, or MASC. This, of course, involved making assumptions as to the area of skin in contact with the mud, the duration of the contact and the rate of absorption of PCBs through the skin and into the blood stream. On the basis of his interviews with the Mancusos, Dr. Webber concluded that "[t]he Mancuso family activities at the marina caused them to have a thick layer of sediment over a large area of skin." (Pl.Exh.L, p. 19.) This seeming-ly ridiculous assumption flies in the face of the Mancusos' testimony that they avoided contact with even the water at the marina, much less the underlying sediment. It would therefore appear obvious that they would do their best to wash off immediately and completely any silt that happened to adhere to their exposed skin. Based on this clearly erroneous assumption, Dr. Webber computed a MASC of 1.55 ppm of PCBs (*Id.*, p. 23).

That conclusion is inconsistent with the EPA's finding that levels of PCBs *six times* that high in residential areas and *thirty times* that high in industrial areas create no unacceptable danger to health. Even so, the acceptable PCB level computed by Dr. Webber is well above the median and not far below the average PCB level of all the marina samples tested (excluding one remote outlier). This is surely why, more than a decade after their life at the marina began, none of the plaintiffs has been diagnosed as having any form of cancer.

Dr. Webber sought to explain the low measured level of PCBs in the marina sediment by suggesting that by the time the test samples were taken, the level of PCBs had been reduced by "tidal flushes" of the silt beds (*Id.* at 27). That attempted explanation proves much too much, because the spill of transformer oil at the ConEd substation occurred in 1981, seven years before plaintiffs moved to the marina. With two tides a day, there had been over five thousand tidal flushes between the time of the spill and the time plaintiffs moved in. If tidal flushes had in fact purged the silt beds of PCBs, as Dr. Webber suggests, plaintiffs could scarcely have had sufficient exposure to PCBs to cause any of their complaints—as, indeed, is confirmed by the low levels of PCBs in plaintiffs' blood.

Dr. Webber's computations thus tend more to undercut than to support Dr. Baturay's conclusions, while his attempted rationalization of the low measured PCB

levels in the marina sediment backfires and all but blows away plaintiffs' claims.

**Step 3: Specific Causation**

Dr. Baturay's report does not disclose any analysis that could fairly be called a differential diagnosis. After listing the many and varied complaints of each of the plaintiffs, she merely states the conclusion that "my physical examination disclosed evidence which is consistent with and indicative of toxic exposure to PCB's and Dioxins." (Exh B, p. 6.) However, as noted above, she cites no medical authority suggesting a causal connection between PCBs and *any* of the listed symptoms.

In the next paragraph, Dr. Baturay purports to rule out all other potential causes of these symptoms by stating:

Under the facts and circumstances of this case [these symptoms] are not consistent with a toxic exposure to any other substance.... [They] are not medically consistent with exposure to any component of sanitary sewage.... Nor ... with exposure to petroleum hydrocarbons (except those contaminated with PCB's and dioxins).... [They] are not consistent with allergic reactions because of the lack of prominent allergens in the Echo Bay area. [The dermatitis] was not of the transient type usually associated with poison-ivy like contact dermatitis ... [and] can only reasonably be associated with toxic exposure to PCB's ... because of the time frame associated with the appearance and persistence of skin lesions and the nature thereof. Therefore, it is my opinion that there is no other reasonable explanation or cause for the medical and physiological conditions that the family demonstrates. (*Id.*, pp. 6–7.)

Again, Dr. Baturay cited no authority whatever for these conclusions. They are thus mere *ipse dixit*, with no apparent support other than Dr. Baturay's expertise. However, as discussed above, Dr. Baturay's expertise in the general subject of the effects of PCB exposure is shaky at best. Moreover, she is not an expert in any of the medical specialties relevant to plaintiffs' complaints: dermatology, pulmonology, neurology or teratology (the science of birth defects). That she would presume, on the basis of her brief physical examination and interview of plaintiffs, and her laboratory tests, to state categorically that every one of their many complaints could have been caused by nothing other than toxic exposure to PCBs is sheer scientific hubris.

Moreover, Dr. Baturay based her conclusions upon many questionable assumptions. For example, she states that plaintiffs' symptoms "are not medically consistent with exposure to any component of sanitary sewage," without any evidence that she has ever tested the sewage dumped into Echo Bay (which is anything but "sanitary") or has any other means of knowing what components it contains. And she assumes "the lack of prominent allergens in the Echo Bay area," when, so far as the record shows, neither she nor anyone else has ever tested the area for allergens.

Thus, Dr. Baturay's opinion that plaintiffs' rashes "can only reasonably be associated with toxic exposure to PCBs" has scant support in the record.

ConEd has submitted a report of Dr. David E. Cohen, a board-certified dermatologist who is Director of Occupational and Environmental Dermatology at New York University Medical Center and Chairman of the Contact Dermatitis Committee of the American Academy of Dermatology and who has "lectured nationally and internationally regarding skin findings in patients exposed to PCB's...." (Exh. X, p. 1). In his report, Dr. Cohen effectively dismantles Dr. Baturay's conclusions insofar as they concern the subject of his specialty, dermatology.

Dr. Cohen begins by emphasizing the need for a thorough inspection of the patient's entire body. Dr. Baturay did not personally conduct any examination of plaintiffs, but merely observed while their

treating physician examined them, and none of the plaintiffs disrobed during the examination (*Id.*, p. 2). Dr. Cohen states that Dr. Baturay's lack of expertise in dermatology is revealed through her use of "terms not used in dermatology," and discussions which, in many instances specified by Dr. Cohen, are "complete gibberish" or mere "word soup" (*Id.*, pp. 3–5).

Insofar as concerns Dr. Baturay's opinion that plaintiffs' skin ailments were caused by exposure to PCBs and dioxins and "are not consistent with a toxic exposure to other substances," Dr. Cohen points out that, in her later deposition, Dr. Baturay recanted this opinion and admitted that the ailments could have been caused by any of thousands of chemicals found in a marina setting, and that she made no effort to exclude such other causes (*Id.*, p. 5). Dr. Cohen names only a few of the chemicals which are normally found in marinas and which could have caused plaintiffs' rashes, including solvents, fuels, oils and glues, particularly epoxy adhesives, which are "extremely potent sensitizers (chemicals that cause allergic rashes)" (*Id.*, p. 6), but adds that there are a myriad of others which could have been responsible:

> There are currently about 2,800 identified chemicals capable of causing allergic contact dermatitis. However, there are over 65,000 chemicals capable of causing irritant contact dermatitis. The difference between the two lies in the cause, since clinically (by examination or biopsy) these skin diseases look identical. Allergic contact dermatitis [such as poison ivy] requires that a person actually develop an allergy or an immune response to the particular chemical.... Irritant dermatitis is a rash that develops because of the ability of a chemical to disturb the skin.... Common offenders of irritant dermatitis are solvents like gasoline, kerosine, mineral spirits, degreasers and strong soaps, acids, bases, ammonia, metal dusts, pesticides and

even water ... from the drying effect. (Exh. U, p. 7.)

Dr. Harbison concurred:

> Mr. Mancuso has indicated that there were high levels of "petroleum substances" routinely discharged through the Thruway storm drain. Therefore there was obviously a potential for dermal exposure to these petroleum products, which consist of aliphatic and aromatic hydrocarbons. Polycyclic aromatic hydrocarbons have been shown to cause skin disorders, including rashes, in humans and animals. Also, Mr. Mancuso used a variety of different organic solvents in his routine operations at the marina, some of which may have resulted in the skin reaction noted by Dr. Jacoby and Dr. Klar. (Exh. X, p. 9.)

It is therefore clear that Dr. Baturay did not even attempt to make a differential diagnosis by realistically assessing the possibility that plaintiffs' symptoms could have been caused by exposure to some substance other than PCBs. She merely announced that there was no such possibility and let it go at that.

### Plaintiffs' Alleged Disorders

The one symptom which at least some of the plaintiffs unquestionably exhibit is a chronic skin rash. However, there is strong reason to doubt Dr. Baturay's opinion as to the etiology of those rashes. As previously noted, Dr. Baturay, who is not a dermatologist and who conducted only a cursory physical examination of plaintiffs, attributes the rashes, along with all of the plaintiffs' other complaints, to toxic exposure to PCBs and dioxins. However, Dr. Cohen, who *is* an eminent dermatologist and *did* thoroughly examine plaintiffs, diagnosed the rashes as atopic dermatitis, a form of eczema resulting from hereditary hypersensitivity (Exh. U). He said that it is definitely not chloracne, which is the "hallmark" of exposure to PCBs. He explained that chloracne is

characterized by multiple comedones (black heads and white heads), yellow cysts often containing straw colored fluid, pustules, abcesses, and marked scarring around the eyes, chin, and behind the ears.... This disease is an unmistakable and disfiguring eruption that is fundamentally different from regular acne (*Id.,* p. 5).

Dr. Harbison concurred:

[the] belief that these [rashes] would be associated with PCB exposure is apparently based on confusion concerning the important differences between skin rashes and the skin disorder considered the hallmark of exposure to PCBs—chloracne. Chloracne is considered by many scientists as the only adverse effect that has been demonstrated conclusively to be associated with high PCB exposure.... Chloracne results from *a high internalized dose of PCBs and is not representative of high dermal exposure.* (Exh. OO, p. 8, citation omitted, emphasis added.)

Dr. Cohen pointed out additional reasons why plaintiffs' rashes are not chloracne, the distinctive skin disorder caused by exposure to PCBs. In the first place, the plaintiffs complained of itching. Dr. Cohen cited a number of "the most respected texts in the field of general dermatology" to support his statements that "itching is not a complaint of those suffering from chloracne." (Exh. U, p. 5.) In the second place, plaintiffs' rashes were mostly localized on their legs and arms. Dr. Cohen quoted from another respected text:

The distribution of chloracne over the body is interesting: The disease has a predilection for the skin of the face, especially in a crescent outside and under the eyes (the malar crescent) and behind the ears. These areas are frequently affected when every other part of the skin is normal.... *The hands, feet and legs are rarely involved* and then only in the worst cases (Exh. OO, p. 8, emphasis added).

In 1992, plaintiffs' treating dermatologist, Dr. Jacoby, likewise diagnosed Deanna's rash as atopic dermatitis (Exh. U, p. 3). He prescribed topical corticosteroid medications of the type used to treat red, itchy skin eruptions. Obviously he did not consider the rash to be chloracne because "Cortisone has no place in the treatment of Acne Vulgaris (common acne) or Chloracne since these medication[s] produce acne lesion called 'steroid acne' and may aggravate existing acne." (*Id.* at 5.) In 1993, Dr. Tobi Klar examined all of the plaintiffs and made a similar diagnosis of "eczematous dermatitis, contact in origin" and prescribed topical steroids which "cleared" their rashes (Exh. Z).

Dr. Cohen explained why several members of the Mancuso family suffer from similar rashes: "Family studies indicate that atopic dermatitis is strongly controlled by genetics and that it clusters in families." (Exh. U, p. 4.)

Dr. Cohen summed up:

Since exposure, which is the opportunity to contact PCBs at the marina, was small, it is my opinion to a reasonable degree of scientific certainty that it is not plausible that the rashes observed in the Mancusos were associated with PCBs.... It is also my opinion to a reasonable degree of scientific certainty that the Mancusos' blood PCB levels were at or below the average concentration for the general New York population, and, as such, the etiology of the rashes is not plausibly related to PCBs (Exh. OO, p. 9).

Nor can any of plaintiffs' other complaints be reliably attributed to PCB exposure. Plaintiffs' pediatric pulmonologist, Dr. Leistner, examined the older daughter, Deanna, and diagnosed her upper respiratory symptoms as post nasal drip. Dr. Cohen diagnosed Frank Mancuso's hair loss as nothing more than androgenetic alopecia or normal male patterned baldness—a common symptom in mature men (Exh. U, p. 3).

Dr. Cohen added there are no published reports associating PCB exposure to hair loss (Exh. OO, p. 15), or bronchospasms (*Id.* at 19), or sensitization syndrome (*Id.* at 20). After examining plaintiffs and reviewing their entire medical histories, Dr. Cohen stated, "In conclusion, it is my opinion that the four members of the Mancuso family do not have *any* illness caused by or suggestive of current or previous exposure to PCB's, Dioxins or PCDF''s [polychlorinated dioxyfurans]." (*Id.*, p. 11, emphasis added.)

## Theresa's Alleged Injuries

The Mancuso's younger daughter, Theresa, was born in 1990, two years after the family moved into the marina. Plaintiffs claim that because she was exposed to PCBs *in utero*, she suffered birth defects resulting, *inter alia*, in a learning disability and personality disorder ("inexplicable outbursts of frustration/rage"). In anticipation of the original trial setting in May 1977, plaintiffs filed the Rule 26 report of their psychiatric expert, Dr. Jeanne Dietrich, who had examined Theresa and administered several standard intelligence and performance tests to her. In that report, which was dated June 28, 1995 (when Theresa was only five years old and had not yet started kindergarten), Dr. Dietrich expressed the opinion that while Theresa's overall intelligence was in the average range, she had "significant attention and memory weaknesses" and "unevenness in cognitive abilities" that would present "stumbling blocks to learning in a traditional manner." Dr. Dietrich concluded that Theresa was suffering from "attention deficit disorder and learning disability (mixed type affecting both language and perceptual domain)."

As previously mentioned, ConEd moved under *Daubert* to exclude the testimony of both Dr. Dietrich and Dr. Schwartz at the trial and, in a lengthy opinion reported at 967 F.Supp. 1437, this Court granted the motion as to Dr. Schwartz but denied it as to Dr. Dietrich. There is no need to repeat or even summarize all of the discussion in that opinion concerning the reliability of Dr. Dietrich's opinion, which covered five pages in the published report. 967 F.Supp. at 1453–57. Suffice it merely to say that in support of that motion ConEd submitted the report of its own psychiatric expert, Dr. Gordon, who criticized Dr. Dietrich's testing methods, particularly her failure to employ the DSM–IV method of determining a specific learning disorder, and strongly contradicted her conclusions. After thorough analysis of the bases for the conflicting opinions of these two experts, the Court concluded that "[a]lthough ConEd's arguments against Dr. Dietrich's conclusion that Theresa is learning disabled are quite powerful, we are not persuaded that Dr. Dietrich's testimony should be excluded." 967 F.Supp. at 1456.

In the four years since Dr. Dietrich's report was written, much has happened in Theresa's life to assist in judging the reliability of Dr. Dietrich's conclusions as to Theresa's learning potential. She has now completed the third grade in school. Her school reports show that she is a well behaved child of average or higher intelligence. She is on the honor roll, which requires an average between 3.0 and 3.49 (Exh. CC). In standardized tests administered at the school, she scored better that 82% of the nation's children in math and better than 68% in reading (Exh. DD). Although her ranking on those tests in comparison with the other students in her elite school are somewhat lower, they are still in the middle range. Her teachers describe her as a "happy" girl whose "pleasant personality has gained her many friends" and who is "kind," "courteous" and "helpful" to other children (Exhs.II, JJ). One of her teachers who was deposed testified that she had never seen Theresa have a rage attack or temper tantrum; just the contrary, she described Theresa as "an extremely happy, enthusiastic learner who really enjoys school ... conscientious, eager to please, just a pleasure to have in class." (Exh. HH.) Another testified that she had never seen a rash on

Theresa, who has a "lovely, youthful" complexion (Exh. GG).

To put it mildly, the record flatly contradicts the opinion of Dr. Baturay (who is not a psychiatrist, psychologist or teratologist) that Theresa has suffered mental and emotional damage as a result of her exposure to PCBs *in utero*—or, for that matter, that she evidences any such damage from any cause. It can only be hoped that Theresa never learns of the disparaging things that have been said about her in support of plaintiffs' claims in this action.

As noted above, in her report, Dr. Baturay lists a number of other symptoms which Theresa exhibits, including fused teeth (Exh. B, p. 6). But nowhere in either that report or her supplemental report does Dr. Baturay mention any of these other symptoms again, much less attempt to establish a recognized association between PCB exposure and fused teeth or any of the other listed symptoms. Nor does Dr. Webber in his report (Exh. L). Nor does Dr. Jesse Bidanset, a toxicologist from St. John's University, in still another report rendered at the request of plaintiffs (Exh. F).

## SUMMARY

The Court is acutely sympathetic with the Mancusos, who bravely struggled to build a secure economic future for themselves and their children, only to find that the business for which they sacrificed so much was doomed to fail by a torrent of filth which turned the basin into a foul-smelling "cesspool" and made it impossible to attract and retain patrons. They quite properly sought a remedy in the courts, but their action against the New York Thruway inexplicably resulted in a jury verdict for the defendant, and in this action their state law claim for property damage was dismissed as time-barred. This left as their only remaining hope for economic relief a claim that they suffered personal injuries as a result of toxic exposure to PCBs.

When none of their treating physicians rendered such a diagnosis, they were forced to search for a non-treating physician who would do so. They began looking at the top of the professional specialty of dermatology, but the expert they chose would not give them an opinion attributing their complaints to PCB exposure. They turned to a general practitioner, but his investigation was so perfunctory and his qualifications in the relevant medical specialties so weak that the Court had no choice but to preclude his testimony.

Finally they turned to Dr. Baturay, who had no prior knowledge whatever about PCBs, and who conducted only a superficial physical examination and laboratory tests which, even if perfectly designed and executed, could only have shown that some component of mud samples from the marina caused sister chromatid exchanges in specially prepared mouse and hamster cells. Even if Dr. Baturay had correctly concluded that these tests showed that something in the mud could lead to cancer in humans, the fact that, after more than a decade, none of the plaintiffs has ever been diagnosed as having cancer merely confirms that plaintiffs' exposure to the mud was not as great as Dr. Baturay thought it was. Dr. Baturay found that although none of the plaintiffs has cancer, they all have a "rational fear and anxiety" about cancer (Exh. B, pp. 8–9, ¶ 12). But, for all the reasons discussed above, there is no reliable scientific basis for believing that any actual PCB contamination of the marina poses even a remote threat of cancer to plaintiffs. Thus, any fear of cancer that they may have is attributable entirely to the opinions of the "experts" they hired to testify in this lawsuit.

Nevertheless, with Dr. Baturay's mantle of academic credentials and her dazzling, even if inappropriate, incantation of medical jargon, she has the troubling potential of misleading a jury of laypersons naturally inclined to be sympathetic to a likable family punished by cruel circumstance and

to give them economic relief at the expense of a deep-pocket defendant.

That is precisely why the Supreme Court in *Daubert* and in the recent *Kumho Tire Co., Inc. v. Carmichael*, U.S. —— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), has imposed on the trial court a "gatekeeper" responsibility. It is a role which no judge would relish; yet this case is a perfect example of why it is necessary. As the Seventh Circuit observed in *Braun v. Lorillard, Inc.*, 84 F.3d 230, 235 (7th Cir.1996):

> [O]ne of the abuses, at which Daubert and its sequelae are aimed ... [is] the hiring of reputable scientists, impressively credentialed, to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to give an opinion helpful to one side in a lawsuit.

Of course, the Court appreciates that the experts on whose opinions ConEd relies to discredit the opinion of Dr. Baturay are also "hired guns." Thus the Court is required to assess the relative scientific merit of conflicting expert opinions in specialized medical fields in which it has little or no prior knowledge. But wiser heads have decreed that it is better for this decision to be made by a judge than by an even less sophisticated jury. Nevertheless we have tried to keep always in mind the right of the parties to have issues of fact resolved by a jury, which means that we must allow the jury to hear proffered expert testimony unless it is *clearly* unworthy of reliance. This Court is fully satisfied that the proposed testimony of Dr. Baturay falls into that category.

### CONCLUSION

For all the reasons discussed, ConEd's motion to preclude the testimony of Dr. Baturay is granted. Because plaintiffs have had more than ample opportunity in this six-year-old case to find a qualified medical expert to support their claims, and the Court, on the basis of all the evidence presented to it, doubts that plaintiffs, even with unlimited time to obtain credible expert testimony, will be able to prove that they have thus far suffered any injury caused by exposure to PCBs, ConEd's motion to dismiss the action is also granted. This dismissal is with prejudice as to any disorder or disease manifested up to the date of this Opinion and Order, but will not bar a new action if any of the plaintiffs are hereafter diagnosed as having any form of cancer or other later-appearing disorder or disease which is causally related to exposure to PCBs or dioxins during the time plaintiffs lived or worked at the Echo Bay marina.

So Ordered.