768 F.2d 57
 22 ERC 2224, 54 USLW 2088, 15 Envtl.
L. Rep. 20,674
 FRIENDS OF THE EARTH and Atlantic States Legal Foundation
and Christian G. Spies, Plaintiffs-Appellants,
Cross-Appellees,
v.
CONSOLIDATED RAIL CORPORATION, Defendant-Appellee, Cross-Appellant.
HUDSON RIVER SLOOP CLEARWATER, INC., Plaintiff-Appellant,
Cross-Appellee,
v.
CONSOLIDATED RAIL CORPORATION, Defendant-Appellee, Cross-Appellant.
 Nos. 942, 1122, 745 and 894, Docket 85-7033, 85-7073,
84-7701 and 84-7715.
 United States Court of Appeals,
Second Circuit.
 Argued March 19, 1985.
Decided July 19, 1985.
 
 Bruce J. Terris, Washington, D.C. (James M. Hecker, Terris & Sunderland, Washington, D.C., Jan S. Kublick, Davoli, McMahon & Kublick, Syracuse, N.Y., of counsel), for plaintiffs-appellants, cross-appellees Friends of the Earth, Atlantic States Legal Foundation and Christian G. Spies.
 Anthony Z. Roisman, Trial Lawyers for Public Justice, Washington, D.C., for plaintiff-appellant, cross-appellee Hudson River Sloop Clearwater, Inc.
 John R. Jenchura, Philadelphia, Pa. (Abbi L. Cohen, Philadelphia, Pa., of counsel), for defendant-appellee, cross-appellant Consolidated Rail Corp.
 Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, D.C., for Chamber of Commerce of U.S.; Stark Ritchie, James K. Jackson, Thomas S. Llewellyn, American Petroleum Institute, Washington, D.C., for American Petroleum Institute; David F. Zoll, Fredric P. Andes, Chemical Mfrs. Ass'n, Washington, D.C., for Chemical Mfrs. Ass'n; Douglas E. Kliever, Charles F. Lettow, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for Synthetic Organic Chemical Mfrs. Ass'n, for amici curiae in Docket Nos. 84-7701 and 84-7715, Chamber of Commerce of the United States, American Petroleum Institute, Chemical Mfrs. Ass'n and Synthetic Organic Chemical Mfrs. Ass'n.
 Bruce J. Terris, James M. Hecker, Terris & Sunderland, Washington, D.C., for amici curiae in Docket Nos. 84-7701 and 84-7715, Friends of the Earth, Atlantic States Legal Foundation and Student Public Interest Research Group of New Jersey.
 Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., James A. Sevinsky, Kathleen Liston Morrison, Mary L. Lyndon, Asst. Attys. Gen., State of New York, Albany, N.Y., for amicus curiae in Docket Nos. 84-7701 and 84-7715, The State of New York.
 Before MESKILL and PRATT, Circuit Judges, and METZNER,* District Judge.
 MESKILL, Circuit Judge:
 
 
 1
 We have consolidated these two appeals for opinion, although they were argued separately,[1] because they arise from similar facts and present a common legal question: whether enforcement actions by the New York State Department of Environmental Conservation (DEC) against Consolidated Rail Corporation (Conrail) that culminated in consent orders preclude the institution of citizen suits under section 505 of the Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act or Act), 33 U.S.C. Sec. 1365 (1982). We conclude that they do not.
 
 
 2
 Hudson River Sloop Clearwater, Inc. (Sloop Clearwater) appeals from a judgment entered in the United States District Court for the Northern District of New York, Miner, J., granting Conrail's motion for summary judgment on the basis of section 505(b)(1)(B), 33 U.S.C. Sec. 1365(b)(1)(B). Friends of the Earth, Atlantic States Legal Foundation and Christian G. Spies (collectively Friends) appeal from a judgment also entered in the United States District Court for the Northern District of New York, Munson, C.J., dismissing their suits against Conrail for lack of subject matter jurisdiction on the basis of section 505(b)(1)(B), 33 U.S.C. Sec. 1365(b)(1)(B). Both judgments denied Conrail's requests for attorneys' fees.
 
 
 3
 We affirm the denials of attorneys' fees. We affirm Judge Miner's decision to the extent that it held that Sloop Clearwater had standing to sue. We reverse Judge Miner's grant of summary judgment for Conrail and against Sloop Clearwater, and we reverse Chief Judge Munson's dismissal of Friends' complaint.
 
 
 4
 * These actions were brought under the citizen suit provision, section 505(a), of the Clean Water Act, 33 U.S.C. Sec. 1365(a). Both alleged violations of National Pollutant Discharge Elimination System/State Pollutant Discharge Elimination System (NPDES/SPDES) permits issued to Conrail by DEC. The permits, which DEC is authorized to issue pursuant to section 402(a) & (b) of the Act, 33 U.S.C. Sec. 1342(a) & (b) (1982), set allowable pollutant discharge limits for particular locations. The Act makes it unlawful for any person to discharge pollutants into navigable waters except in compliance with the limits and conditions of a discharge permit.
 
 
 5
 Prior to the filing of these suits, Conrail's permit violations led to administrative involvement by DEC and resulted in the execution of orders of consent between Conrail and DEC. At no time during the negotiations between Conrail and DEC did Sloop Clearwater, Friends or any other members of the public have an opportunity to participate.
 
 
 6
 A. Sloop Clearwater and Conrail's Selkirk Yard
 
 
 7
 Sloop Clearwater is a not-for-profit New York corporation dedicated to the protection and restoration of the Hudson River. An environmentalist, public interest organization, it engages in research, monitoring, education and advocacy on behalf of its members. Sloop Clearwater has approximately 5,000 members who reside in New York State. Several members reside, own property or recreate in, on or near the Hudson River and South Albany Creek.
 
 
 8
 Sloop Clearwater's suit involves Conrail's A.E. Perlman Yard in Selkirk, New York (Selkirk Yard), a diesel locomotive repair and refueling facility, which discharges treated wastes from its operations through point sources into the Hudson River and South Albany Creek. Although authorized by an NPDES/SPDES permit to discharge limited quantities of pollutants into these waterways, the Selkirk Yard failed to comply with the permit limitations. In September 1979, Conrail entered into a consent order with DEC regarding the Selkirk Yard permit violations. It imposed a number of obligations on Conrail, including a timetable, related to the construction of a wastewater treatment facility. The order also assessed a $25,000 penalty against Conrail, $5,000 to be paid immediately and the remainder to be suspended for as long as Conrail complied with the order. Conrail did not comply, but it was never penalized, and the order was repeatedly modified. After a number of extensions, Conrail completed construction on the $2 million project in April 1984, considerably after its original December 1982 deadline. Conrail claims to have been in compliance with its Selkirk Yard permit since July 1984.
 
 
 9
 In September 1982, Sloop Clearwater notified Conrail of its intention to institute a citizen suit to enforce compliance with the Selkirk Yard permit. It filed suit in November 1982 and moved for partial summary judgment on the issue of liability. Conrail moved to dismiss the complaint or in the alternative for summary judgment. The district court first addressed Conrail's contention that Sloop Clearwater lacked standing. Noting that Sloop Clearwater had produced affidavits from two of its members setting forth specific injury in precise terms, the court determined that there was standing. Hudson River Sloop Clearwater, Inc. v. Consolidated Rail Corp., 591 F.Supp. 345, 348 (N.D.N.Y.1984). Turning to Conrail's claim that the DEC administrative proceeding and the resultant consent order precluded a citizen suit under section 505(b)(1)(B), the court agreed that DEC's enforcement proceedings and the resultant consent order were the equivalent of a diligently prosecuted court action and granted summary judgment for Conrail.
 
 
 10
 On appeal, Sloop Clearwater argues that the administrative proceedings and consent order are insufficient to activate the bar of section 505(b)(1)(B). Conrail supports the district court's section 505 conclusion but contends that Sloop Clearwater lacks standing. It also maintains that it is entitled to attorneys' fees.
 
 B. Friends and Conrail's DeWitt Yard
 
 11
 Friends of the Earth is a not-for-profit New York corporation dedicated to protecting and enhancing natural resources. Of its approximately 32,000 active members, more than 8,000 live in New York. Atlantic States Legal Foundation, Inc., also a not-for-profit New York corporation and membership organization, is similarly dedicated to the protection and restoration of natural--and especially water--resources along the Atlantic Coast. Both organizations have members who live or own property in the vicinity of or recreate in, on or near Butternut Creek. Christian G. Spies, a resident of Syracuse, has been a birdwatcher for twenty years and frequently watches birds at Butternut Creek.
 
 
 12
 Conrail's DeWitt Yard, located in Syracuse, New York, is a facility for the inspection, maintenance and repair of diesel engines. Conrail is authorized by the NPDES/SPDES permit to discharge limited quantities of pollutants from the DeWitt Yard into Butternut Creek.
 
 
 13
 In response to repeated permit violations at the DeWitt Yard, DEC began negotiations with Conrail that resulted in a consent order signed in June 1979. The order imposed a $1,000 penalty against Conrail and incorporated a timetable for the modernization of the DeWitt Yard waste treatment facility to achieve permit compliance by December 1980. The order, which contained no penalties in the event that Conrail failed to meet its terms, was modified twice to extend the completion date. The project was finally completed in November 1982 at a cost in excess of $1 million. Although the DeWitt Yard continued to experience compliance problems, the district court found that the yard had achieved "substantial compliance" as of April 1984. The record indicates at least one violation in May 1984.
 
 
 14
 In June 1983, Friends sent Conrail notice of their intention to sue to enforce compliance. In November 1983 they filed suit seeking, as had Sloop Clearwater, injunctive and declaratory relief as well as civil penalties. Friends moved for partial summary judgment on the issue of liability for permit violations. Conrail cross-moved to dismiss or in the alternative for summary judgment. The district court denied Friends' motion and granted Conrail's motion to dismiss for lack of subject matter jurisdiction. In reasoning parallel to that in the Sloop Clearwater decision, the court held that DEC's involvement with Conrail over the violations and the resulting consent order were the equivalent of a diligently prosecuted action in a court. Therefore, it ruled that Friends' suit was barred by section 505(b)(1)(B).
 
 
 15
 Friends' arguments on appeal essentially mirror those of Sloop Clearwater. Friends claim that the district court misconstrued the prohibition stated by section 505. Conrail disagrees and again contends that the district court should have awarded it attorneys' fees.
 
 II
 A. Sloop Clearwater's Standing to Sue
 
 16
 On the basis of Sierra Club v. SCM Corp. 747 F.2d 99 (2d Cir.1984), which also involved a citizen suit under the Clean Water Act, we reject Conrail's challenge to Sloop Clearwater's standing. Sierra Club, like Sloop Clearwater, was the sole plaintiff in its suit. In the complaint, Sierra Club alleged that its members, none of whom were identified by name, lived in the vicinity of, owned property near or recreated in or near the waterway into which the defendant was discharging pollutants. Id. at 101. We concluded that the Clean Water Act's definition of "citizen" in section 505(g) "as a 'person or persons having an interest which is or may be adversely affected,' means those who can claim injury in fact within the meaning of [Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ]." SCM, 747 F.2d at 105.
 
 
 17
 The Supreme Court in Morton explained that "an organization whose members are injured may represent those members," but that an organization whose members alleged an interest but no injury was not adversely affected and thus could not have standing. 405 U.S. at 739, 92 S.Ct. at 1368. The Court readily acknowledged that injury to aesthetic and environmental well being, as well as economic harm, could provide the requisite injury to confer standing. Id. at 734, 92 S.Ct. at 1365.
 
 
 18
 Drawing on the Supreme Court's reasoning, we determined in SCM that Sierra Club would have standing to bring a citizen suit only if it could show "actual injury within the meaning of Morton, by, for example, providing a concrete indication that [it] or one or more of its members used the [waterway at issue] or would be affected by its pollution." SCM, 747 F.2d at 107.
 
 
 19
 The individual affidavits that Sloop Clearwater submitted to the district court quite adequately satisfy the standing threshold. Affiant Robert Rienow stated that he passes the Hudson regularly and "find[s] the pollution in the river offensive to [his] aesthetic values." J.App. at 333. Affiant Richard Endreny averred that his children swim in the river, his son occasionally fishes in the river and his family has and will continue to picnic along the river. These allegations are sufficient to show the injury in fact required by Morton and SCM. The district court correctly determined that Sloop Clearwater had standing to sue.
 
 B. The Section 505(b)(1)(B) Preclusion
 
 20
 The preeminent question presented by these appeals, as previously noted, concerns the preclusion of citizen suits under section 505(b)(1)(B) of the Clean Water Act. According to that subsection, a citizen suit is precluded "if the Administrator [of the Environmental Protection Agency (EPA) ] or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order." Conrail and the two district courts below posit that the DEC enforcement actions and the consent orders are the functional equivalent of a diligently prosecuted action in a court and therefore operate to bar Sloop Clearwater's and Friends' suits. This approach was inspired by the Third Circuit's opinion in Baughman v. Bradford Coal Co., 592 F.2d 215 (3d Cir.), cert. denied, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). See also Student Public Interest Research Group of New Jersey, Inc. v. Fritzsche, Dodge & Olcott, Inc., 759 F.2d 1131 (3d Cir.1985). Although the Third Circuit's reasoning has been adopted by several district courts in addition to the two below, see, e.g., Sierra Club v. SCM Corp., 572 F.Supp. 828 (W.D.N.Y.1983); Love v. New York State Department of Environmental Conservation, 529 F.Supp. 832 (S.D.N.Y.1981); Gardeski v. Colonial Sand & Stone Co., 501 F.Supp. 1159 (S.D.N.Y.1980), no other circuit court has yet addressed it.
 
 
 21
 The Baughman Court's starting point was the notion that "an administrative board may be a 'court' if its powers and characteristics make such a classification necessary to achieve statutory goals." 592 F.2d at 217. It extrapolated this view from a First Circuit case, Volkswagen de Puerto Rico, Inc. v. Puerto Rico Labor Relations Board, 454 F.2d 38 (1st Cir.1972), in which the court construed the language of the federal removal statute, 28 U.S.C. Sec. 1441 (1982), in the peculiar context of section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 (1982), and concluded that the Puerto Rico Labor Relations Board was a "court" for the limited purpose of removal. 454 F.2d at 44-45. The Baughman Court moved from the Volkswagen case to highlight some of the legislative history of the citizen suit provision of the Clean Air Act, section 304, 42 U.S.C. Sec. 7604 (1982). Baughman, 592 F.2d at 218. The materials cited primarily emphasized the importance of the citizen suit in the overall enforcement scheme. From this predicate, the Baughman Court concluded that the "action in a court" language of section 304(b)(1)(B) of the Clean Air Act, the wording of which closely parallels the Clean Water Act language, could encompass an administrative tribunal as well as a court.
 
 
 22
 The court went on to list the factors to be evaluated in determining whether a particular administrative tribunal should be considered a "court." They fell into two general categories: whether the tribunal has "the power to accord relief which is the substantial equivalent to that available to the EPA in federal courts," particularly the power to enjoin and the power to assess meaningful penalties, and whether the procedures of the tribunal are comparable to the procedures applicable to federal court suits brought by the EPA. Baughman, 592 F.2d at 219. Of special concern procedurally was whether citizens were afforded intervention as of right, as guaranteed by section 304(b)(1)(B), in federal Clean Air Act suits brought by the EPA, or whether intervention was only at the discretion of the tribunal. Baughman, 592 F.2d at 219. Applying this analysis, the Baughman Court concluded that the Pennsylvania Environmental Hearing Board was not a "court" because it could not enjoin violators, it could impose a maximum penalty of only $10,000 and it did not permit intervention as of right. Id.
 
 
 23
 In the very recent Student Public Interest decision, the Third Circuit reviewed the Baughman decision in detail. The court applied Baughman's dual inquiry to the question whether an EPA administrative enforcement action should be characterized as a "court" proceeding under section 505(b)(1)(B) of the Clean Water Act. The court looked first at the enforcement powers available to the EPA in agency actions unaided by federal court involvement. It then scrutinized the procedures employed by the EPA in its administrative actions. Interestingly, as in Baughman, the court in Student Public Interest invoked the functional equivalency analysis only to conclude that the proceeding before it could not properly be deemed a "court" and that, therefore, the citizen suit was not barred. 759 F.2d at 1135, 1139. The court failed to question or even to comment on the strength of the basis for or the soundness of the Baughman formulation.
 
 
 24
 If we were to accept the Baughman approach, we would have to conclude that the DEC administrative proceeding should not be accorded "court" status. DEC's enforcement powers are significantly weaker than those available to the EPA in the federal courts. DEC cannot enjoin polluters without the assistance of the New York Attorney General and a court order. N.Y. Envtl. Conserv. Law Sec. 71-1931 (McKinney 1984). Further, it is unclear whether, without judicial imprimatur, DEC can assess penalties in excess of $1,000 per violation. See id. Sec. 71-1725; id. Sec. 71-1929. Nor do DEC's procedures meet the Baughman minimum. Citizens are not permitted to intervene as of right and the DEC enforcement procedure "does not otherwise resemble a suit in federal court in that it embraces none of the procedural safeguards found in federal court proceedings." Student Public Interest, 759 F.2d at 1139.
 
 
 25
 We need not elaborate further, however, because we decline to adopt the Baughman approach. The Clean Water Act citizen suit provision unambiguously and without qualification refers to an "action in a court of the United States, or a State." Sec. 505(b)(1)(B). It would be inappropriate to expand this language to include administrative enforcement actions.
 
 
 26
 It is a "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Moreover, when a court finds the language of a statute to be clear and unambiguous, "judicial inquiry is complete, except in 'rare and exceptional circumstances.' " Garcia v. United States, --- U.S. ----, ----, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984) (quoting TVA v. Hill, 437 U.S. 153, 187, 98 S.Ct. 2279, 2298 n. 22, 57 L.Ed.2d 117 n. 22 (1978)); Ex Parte Collett, 337 U.S. 55, 61, 69 S.Ct. 944, 947, 93 L.Ed. 1207 (1949); Gramaglia v. United States, 766 F.2d 88, 92 (2d Cir. 1985); Hamker v. Diamond Shamrock Chemical Co., 756 F.2d 392, 395 (5th Cir.1985). "[O]nly the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language." Garcia, --- U.S. at ----, 105 S.Ct. at 482-483.
 
 
 27
 Although we need not probe the legislative history of section 505 to support our conclusion, cf. id., we nevertheless note that Conrail has not cited to and our own research has failed to disclose any indication that Congress meant other than what it plainly stated in section 505(b)(1)(B). The citizen suit provision of the Clean Water Act was explicitly modeled on the similarly worded section 304 of the Clean Air Act. Natural Resources Defense Council v. Train, 510 F.2d 692, 699 (D.C.Cir.1975). In enacting the Clean Air Act provision, "Congress made clear that citizen groups are not to be treated as nuisances or troublemakers but rather as welcomed participants in the vindication of environmental interests." Friends of the Earth v. Carey, 535 F.2d 165, 172 (2d Cir.1976). Section 304, as the D.C. Circuit explained, "took broad steps to facilitate the citizen's role in the enforcement of the Act." Natural Resources Defense Council, 510 F.2d at 700. Also recognizing the "obvious danger that unlimited public actions might disrupt the implementation of the Act and overburden the courts," id., Congress incorporated explicit restrictions on citizen suits. Accordingly, section 304 citizen suits may be brought to address only specific rather than generalized violations, they may not be commenced prior to sixty days after appropriate notice has been given and they are precluded where the enforcing agency has already instituted judicial proceedings. The Clean Water Act citizen suit provision is a "clear parallel" of section 304 of the Clean Air Act, id. at 702, and its legislative history, while not as extensive, "mirrors the history of section 304 in all significant respects." Id. at 701 n. 46.
 
 
 28
 To interpret section 505(b)(1)(B) to include administrative as well as judicial proceedings is in our view contrary to both the plain language of the statute and congressional intent. Congress has frequently demonstrated its ability to explicitly provide that either an administrative proceeding or a court action will preclude citizen suits. See, e.g., Toxic Substances Control Act, 15 U.S.C. Sec. 2619(b)(1)(B) (1982); Endangered Species Act, 16 U.S.C. Sec. 1540(g)(2) (1982); Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. Sec. 1415(g)(2) (1982); Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98-616, Sec. 401(d), 98 Stat. 3221, 3269-70 (amending Solid Waste Disposal Act, 42 U.S.C. Sec. 6972(b) (1982)). Had Congress wished to impose this broader prohibition on citizen suits under the Clean Water Act, it could easily have done so. It did not.
 
 
 29
 We hold that in accordance with its plain language section 505(b)(1)(B) will operate to preclude a citizen suit only if the Administrator of the EPA or a state has initiated and is diligently prosecuting an action in a state or federal court. Our holding obviates the need to determine, in this case, the meaning of diligent prosecution.
 
 
 30
 We affirm the district court's decision in Sloop Clearwater to the extent that it held that Sloop Clearwater had standing to sue and denied Conrail's request for attorneys' fees. We reverse that part of the judgment that granted summary judgment against Sloop Clearwater and remand the cause to the district court for further proceedings. We affirm the judgment of the district court in Friends only insofar as it denied Conrail's request for attorneys' fees. We reverse that part of the judgment that dismissed Friends' complaint and remand the cause to the district court for further proceedings. We award costs to Sloop Clearwater on its appeal and to Friends of the Earth, Atlantic States Legal Foundation and Christian G. Spies on theirs.
 
 
 
 *
 Honorable Charles M. Metzner, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The appeals were argued on the same day, one right after the other