Frank MANCUSO, Ellen Mancuso, individually and on behalf of their children, Deanna and Theresa Mancuso and F. Mancuso Boat Yard, Inc. d/b/a Echo Bay Marine, Plaintiffs,

v.

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Defendant.

No. 93 Civ. 0001(WCC).

United States District Court,
S.D. New York.

Feb. 16, 2001.

Law Office of John Tartaglia LLP, John A. Tartaglia, of counsel, Bedford, NY, for Plaintiffs.

Charles E. McTiernan, Jr., Consolidated Edison Company of New York, Inc., Richard J. Giglio, of counsel, New York City, for Defendant.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

On January 4, 1993, Frank Mancuso ("Mancuso") and his wife brought this action against defendant Consolidated Edison Company of New York, Inc. ("Con Ed"), for personal injury to themselves and their children and for property damage in violation of the Clean Water Act ("CWA" or the "Act"), 33 U.S.C. § 1365, and New York State law. On December 12, 1994, Judge .Broderick of this Court granted defendant's motion to dismiss the property damage claims as time-barred. *See Mancuso v. Consolidated Edison Co. of N.Y., Inc.*, No. 93 Civ. 0001, 1994 WL 702749, at *1 (S.D.N.Y. Dec.12, 1994), *aff'd on reconsideration*, 905 F.Supp. 1251 (S.D.N.Y.1995). On July 30, 1999, this Court granted defendant's motion for summary judgment and dismissed the action with prejudice based upon plaintiffs' failure to secure competent expert testimony

that would support their claims of personal injury. *See Mancuso v. Consolidated Edison Co. of N.Y., Inc.*, 56 F.Supp.2d 391 (S.D.N.Y.1999) (the "1999 Opinion"), *aff'd in part and vacated in part*, No. 99–9233, 216 F.3d 1072, 2000 WL 730417 (2d Cir. June 5, 2000). On appeal, the Second Circuit affirmed our dismissal of the personal injury claims but vacated our dismissal of the CWA claim and remanded the case for consideration of that claim without addressing the merits. *See Mancuso v. Consolidated Edison Co. of N.Y., Inc.*, No. 99–9233, 216 F.3d 1072, 2000 WL 730417 (2d Cir. June 5, 2000).

Plaintiffs claim that defendant has violated the CWA by discharging pollutants into Echo Bay through contaminated drain pipes, tunnels, conduits and cable ducts and by water runoff from the contaminated soil at defendant's adjoining substation.

Pursuant to the CWA plaintiffs seek: (1) a declaration that defendant is in violation of the Act; (2) an order that defendant remedy all damage to the environment caused by its illegal discharges; (3) civil penalties of $25,000 per day paid to the U.S. Treasury for each day defendant violates the Act by failing to pursue cleanup after a finding of violation by the trier of fact; (4) attorneys fees and costs; and (5) any other relief this Court deems just and proper.[1] Defendant has renewed its motion for summary judgment, pursuant to FED. R. CIV. P. 56(b), based upon plaintiff's lack of standing.[2] For the reasons stated hereinafter, the CWA claim is dismissed with prejudice.

## BACKGROUND [3]

In 1981, there was a fire in defendant's substation which caused oil containing polychlorinated biphenyls ("PCB"s) to spill from a transformer into its surrounding moat.[4] After testing the soil at and around the substation, the New York State Department of Environmental Conservation ("DEC") ordered a cleanup, resulting in the substation's closure. There has always been a sharp disagreement as to extent which this oil spillage resulted in PCB contamination of the soil and water of Echo Bay and the adjoining Echo Bay Marina.

In 1987, F. Mancuso Boatyard, Inc., a corporation owed by Mancuso, purchased the Marina from Robert Kolasch. In the summer of 1988, plaintiffs moved to the Marina where they resided with their children until 1992. Mancuso owned the property until May, 1993, when it was acquired

1. In the complaint, plaintiffs sought civil penalties of $25,000 per day for each day of the violation pursuant to the CWA. On July 26, 1994, at a discovery conference held before Magistrate Judge Fox, plaintiffs stated that they were seeking civil penalties from the date of a finding by the Court that there has been a violation, and for every day that the clean up does not occur thereafter. On April 26, 1997, at another conference held before Magistrate Judge Fox, plaintiffs attempted to amend their claim to assert civil penalties from the date the notice of violation was served on defendant. Magistrate Judge Fox held that plaintiffs had abandoned this claim during discovery and was therefore precluded from resurrecting it. Plaintiffs did not appeal that decision to this Court.

2. Originally, plaintiff Frank Mancuso brought this action with Ellen Mancuso, individually and on behalf of their children, Deanna and Theresa Mancuso, and F. Mancuso Boat Yard, Inc., d/b/a Echo Bay Marina Inc. The instant motion concerns only whether Frank Mancuso has standing. However, the Court notes that because the other individual plaintiffs did not submit any evidence, through affidavits or otherwise, that would establish standing in this case, this Court *sua sponte* finds that none of them have standing in this case.

3. Other relevant facts are set forth in this Court's prior Opinions and Orders, with which this Court assumes familiarity. *See Mancuso*, 56 F.Supp.2d at 391; *Mancuso v. Consolidated Edison Co. of N.Y., Inc.*, 967 F.Supp. 1437 (S.D.N.Y.1997); *Mancuso v. Consolidated Edison Co. of N.Y., Inc.*, 905 F.Supp. 1251 (S.D.N.Y.1995); *Mancuso*, 1994 WL 702749, at *1; *Mancuso·v. Consolidated Edison Co. of N.Y., Inc.*, No. 93 Civ. 0001, 1993 WL 525241 (S.D.N.Y. Dec.13, 1993).

4. PCBs are toxic, colorless chemicals which are used as dielectric coolants in electrical components, such as transformers.

by the City of New Rochelle at a foreclosure sale for the non-payment of real estate taxes. (Giglio Aff. ¶ 5, Ex. A.) Plaintiffs currently reside in Dutchess County, New York. (Def.Sur.Mem., Ex. A.) They do not work anywhere in the vicinity of New Rochelle. (*Id.*) From 1993 to 1997, Mancuso's only contact with Echo Bay consisted of visits to acquire evidence for this case. (*Id.*)

Argument on the instant motion centers around Mancuso's contacts with Echo Bay since 1998. Initially, the motion was based upon Mancuso's original response to defendant's third set of interrogatories. (Giglio Aff. ¶ 5, Ex. C.) He stated that he visited Echo Bay on May 8, 1998, in the company of his and defendant's attorneys in order to obtain discovery in connection with this lawsuit. Interrogatory No. 2 asked: "In the period after May 8, 1998, has any plaintiff or any person acting on behalf of any plaintiff been (1) *at, in, on, or in sight* of Con Edison's Echo Avenue property, (2) *at, in, on, or in sight* of the property formerly owned by Frank Mancuso on Echo Bay, or (3) *at, in, on, or in sight* of Echo Bay." (*Id.*) (emphasis added). Mancuso responded in the affirmative and identified only one visit, on January 11, 2000, when he met with environmental groups to discuss possible remedial action. (*Id.*)

However, in response to the motion, Mancuso filed an affidavit stating: that he "regularly travel[s] to Echo Bay and the marina property and ... ha[s] regularly observed the substation at least once a week for the last three years to note defendant's clean-up operations" (Mancuso Aff. at 1); that he and his family have spent thousands of hours preparing for this case and that on 29 occasions between January 1998 and February 1999, he took 117 photographs of defendant's substation as well as videotapes (*id.* at 2); that he swam in Echo Bay as a child and sailed in

it since 1972 (*id.*); that he still visits Hudson Park, located near Echo Bay, and often drives or walks by defendant's substation (*id.*); that he has "always had, and continue[s] to have, an active aesthetic and environmental interest in Echo Bay" and therefore corresponds with state and county agencies to discuss its condition (*id.* at 2–3); that he often travels to New Rochelle to visit family and friends and to speak with swimmers, boaters, fisherman and children about the defendant's substation (*id.* at 4); and that in the summer of 2000, he and his family attended a play and concerts in Hudson Park, located near Echo Bay. (*Id.*)

When defendant, in its reply memorandum, accused Mancuso of perjury based on contradictions between that affidavit and his interrogatory answers, Mancuso submitted amended interrogatory answers together with an affirmation stating that he had been confused by the interrogatories and believed that Interrogatory No. 2 referred only to his actual on-site visits to defendant's substation. (Mancuso Affm. at 1.) Accordingly, he changed the answer to state that he has visited Echo Bay on January 11, 2000 as well as:

> [V]arious other dates, precise dates unknown, for being at or near or in sight of the property. Frank Mancuso regularly travels to Echo Bay and the marina property and regularly observed the substation at least once a week for the last three years to note Con Edison's cleanup operations. Photographs and Videos provide the dates where such film was taken.

To corroborate this amended answer, Mancuso has submitted 118 photographs, and one videotape. Defendant, surprised by Mancuso's apparent change of position, asks this Court to exclude the amended interrogatory answers and the allegedly perjured affidavit.[5] Plaintiff argues that

---

**5.** After all of the relevant documents were submitted to this Court, plaintiffs' attorney objected to the 4th, 5th, 6th, 7th, 8th, 13th,

14th, and 15th sentences in the second full paragraph on the third page of defendant's surreply memorandum. Defendant subse-

defendant is collaterally estopped from raising the standing issue because it was unsuccessfully litigated on the appeal to the Second Circuit.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The general rule is that the party invoking federal jurisdiction bears the burden of establishing all of the elements of standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Because standing is an "indispensable part of plaintiff's case," plaintiff bears the burden of providing sufficient evidence of standing to survive a motion for summary judgment. *Id.*, 112 S.Ct. at 2136. Plaintiff cannot rest on "mere allegations," but must set forth "specific facts" by affidavit or other evidence. *Id.*, 112 S.Ct. at 2137. On a motion for summary judgment, these facts must be accepted as true. *Id.*, 112 S.Ct. at 2137.

### II. *Subject Matter Jurisdiction*

Mancuso argues that defendant is collaterally estopped from raising the standing issue because defendant has known of all relevant facts since 1993 and that issue was raised in the briefs submitted to the Second Circuit in connection with plaintiffs' appeal of this Court's 1999 Opinion. Although the Second Circuit did not comment upon whether plaintiffs had standing under the CWA, Mancuso argues that the Court implicitly determined that standing was present when it remanded the case for reconsideration of the CWA claim. Therefore, according to Mancuso, because the

matter was "distinctly put in issue and directly determined by a court of competent jurisdiction ... [it] cannot be disputed in a subsequent suit between the same parties or their privies." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (citations omitted). We reject that argument.

First, after review of the relevant portion of the appellate briefs, we conclude that the standing issue was never raised by the parties. The briefs concentrated on whether this Court's dismissal with prejudice should be applied to the CWA claim. (Pl. Cert. & Summ. Doc. Evid., Exs. 1, 2.) The Court of Appeals did not address the merits of any issues raised by the CWA claim. We certainly cannot infer that its silence constituted a ruling on the issue of standing.

Second, "[f]ederal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). "The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)); *see generally* 15 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 101.30[2] (Daniel R. Coquilette et al. eds., 3d ed.2000).

Therefore, the issue of standing can be raised on motion of a party or even *sua sponte* at any time during the litigation or appeal; it cannot be waived. *See United States v. Hays*, 515 U.S. 737, 742,

---

quently withdrew those statements from its memorandum. Accordingly, they are not a part of the record. However, this Court de-

nied plaintiffs' attorney's request to order the Clerk of the Court to physically expunge those sentences from the record.

115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995); *Bender*, 475 U.S. at 541–42, 106 S.Ct. at 1331; *Mehdi v. United States Postal Serv.*, 988 F.Supp. 721, 730 n. 7 (S.D.N.Y.1997); FED. R. CIV. P. 12(h)(3). We therefore must determine whether plaintiffs can invoke the power of this Court.

### III. *CWA*

The CWA prohibits the discharge of pollutants into navigable waters in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §§ 1251(a), 1311(a). To achieve these goals, it provides for citizen suits in addition to state actions. Thus, pursuant to the CWA, "any citizen may commence a civil action on his own behalf" against any person in violation thereof. *Id.* § 1365(a). The term "citizen" is defined as "a person or persons having an interest which is or may be adversely affected by the alleged violation." *Id.* § 1365(g).

This broad language has been interpreted to confer standing on as many people as Article III of the Constitution would permit. *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 16, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981); *Hudson Riverkeeper Fund, Inc. v. Yorktown Heights Sewer Dist.*, 949 F.Supp. 210, 212 (S.D.N.Y.1996). Article III empowers federal courts to adjudicate only "actual 'cases' and 'controversies,'" a central component of which is standing. *Allen*, 468 U.S. at 750, 104 S.Ct. at 3324. Three constitutional requirements must be satisfied in order to establish it:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a "causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan*, 504 U.S. at 560–61, 112 S.Ct. at 2136 (citations omitted).

### A. *Injury in Fact*

■ Persons who have suffered an "injury in fact" under *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), satisfy the requirements of the CWA. *See Middlesex County Sewerage Auth.*, 453 U.S. at 16, 101 S.Ct. at 2625; *Sierra Club. v. SCM Corp.*, 747 F.2d 99, 105 (2d Cir.1984). Economic harm is not required to confer standing in environmental pollution cases; "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183, 120 S.Ct. 693, 705, 145 L.Ed.2d 610 (2000) (quoting *Morton*, 405 U.S. at 735, 92 S.Ct. at 1361; *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 60 (2d Cir.1985). Because "[a]esthetic perceptions are necessarily personal and subjective, and different individuals who use the same area for recreational purposes may participate in widely varying activities, according to different schedules," standing is conferred upon many individuals. *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1150 (9th Cir. 2000).

In *SCM*, the Second Circuit stated that an organization would have standing if it could show that " '[it] or one or more of its members used the [waterway at issue] or would be affected by its pollution.'" *Consolidated Rail Corp.*, 768 F.2d at 61 (quoting *SCM*, 747 F.2d at 107). Furthermore, where there is a direct nexus between the plaintiff and allegedly polluted area, no

circuit has required scientific proof of contamination at the summary judgment stage. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 159 (4th Cir.2000). Therefore, "specific allegations or evidence of the actual level of the pollution in the waterway" is not necessary. *Id.*

Every appellate court that has considered standing under the CWA has adopted a low threshold of entry. In *Consolidated Rail Corp.*, the Second Circuit found that standing was established through one member's averment that he passes the Hudson River regularly and "find[s] the pollution in the river offensive to [his] aesthetic values" and another who averred that his family fishes, swims and picnics along the river. 768 F.2d at 61; *see also Hudson Riverkeeper Fund*, 949 F.Supp. at 212 (granting standing to a member of a society who averred that the defendant's pollution caused the fishing in the waters by which he regularly fished to worsen). The Eighth Circuit has upheld standing for a group of members who "visit, cross, and frequently observe" the polluted area and occasionally use the water for recreational purposes. *See United States v. Metropolitan St. Louis Sewer Dist.*, 883 F.2d 54, 56 (8th Cir.1989). The Fourth Circuit has even upheld standing to an organization's member who hiked along a polluted river. *See Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1112 n. 3 (4th Cir.1988).[6]

■ However, there are limitations as to those on whom standing will be conferred. A person who has no connection to the polluted area does not have standing under the CWA. *See, e.g., Wademan v. Concra*, 13 F.Supp.2d 295, 303 (N.D.N.Y. 1998) (denying standing to an ex-employee who would not return to her former workplace). Therefore, the issue is whether plaintiff has established the "identifiable

trifle" of an injury that either has or will imminently occur as a result of the conduct. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973).

In this case, Mancuso averred that:

I swam in Echo Bay as a child and sailed in it since 1972 ... I still visit Echo Bay and the New Rochelle waterfront area. My family and I still visit Hudson Park, located on Echo Bay, and often drive or walk by the Con Edison substation. My aesthetic and environmental sensibilities are really injured from the pollution emanating from Con Ed's substation ... ever since I first witnessed deformed and tumored animals in the waters of Echo Bay. My own family's condition are of great concern to me and forever will be.

(Mancuso Aff. at 2.)

■ Mancuso's averments that his aesthetic sensibilities have been offended when viewing tumored animals as he passes the property on his walks to picnics in the park and visits to the waterfront, are similar to those which were ruled to confer jurisdiction in *Consolidated Rail Corp.*, namely that the plaintiff walks by the Hudson River and that the pollution thereof offends his aesthetic senses. Although there is no precise formula to determine what constitutes "concrete injury," it is well settled that residency in the polluted area is not required. *See Ecological Rights Found.*, 230 F.3d at 1150 ("Factors of residential contiguity and frequency of use may certainly be relevant to that determination, but are not to be evaluated in a one-size-fits-all, mechanistic manner."). Unless this Court excludes Mancuso's amended interrogatory answers and affidavit, *see infra* Part III.A.1.i.-ii., all of the factual averments therein must be taken as true, and, in light of the minimal

---

**6.** Because an organization does not have standing unless its members can establish injury in fact, *see Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), the above rules apply equally to individual standing cases.

requirement for standing under the CWA, these factors are sufficient to establish injury in fact.

We do not deem it significant that there is a "No Trespassing" sign on the fence surrounding the substation. (Def. Sur. Mem. at 2, Ex. B.) Plaintiff has alleged injury with respect to his viewing of the Bay and not the substation. Nor is ˙it destructive of standing that Mancuso's visits have become less frequent because he now lives two hours from the polluted area.[7] (Def. Sur. Mem. at 2, Ex. B.) In *Laidlaw,* the Supreme Court found that every member of an organization had standing, even though some members did not specify residency, one lived 20 miles away from the offending incinerator and another canoed 40 miles away. 120 S.Ct. at 705; *see also Ecological Rights Found.,* 230 F.3d at 1149.

### 1. *Exclusion of Mancuso's Statements*

██ Defendant contends that Mancuso's amended interrogatory answers and affidavit should be stricken because they are flatly contradicted by Mancuso's previous answers to interrogatories.

#### i. *Amended Interrogatory Answers*

As stated above, Mancuso claims that he was confused by Interrogatory No. 2 which asked: "In the period after May 8, 1998, has any plaintiff or any person acting on behalf of any plaintiff been (1) *at, in, on, or in sight* of Con Edison's Echo Avenue property, (2) *at, in, on, or in sight* of

the property formerly owned by Frank Mancuso on Echo Bay, or (3) *at, in, on, or in sight* of Echo Bay." (emphasis added). Mancuso asserts that he understood the question to refer only to those times when he was actually on defendant's premises and not those times he was in sight of Echo Bay. (Mancuso Affm., dated Jan. 12, 2001, at 1.)

We are puzzled why someone, with the assistance of counsel, would be so confused by such concise questions that he neglected to state that he had "observed the substation at least once a week for the last three years to observe defendant's cleanup operations" or that he repeatedly visited the nearby park with his family. Nevertheless, in an effort to corroborate the fact that he had been present at Echo Bay on various dates not detailed his answer to the interrogatory, Mancuso submits belatedly (after the filing of defendant's reply brief) approximately 118 photos and a videotape.[8]

The Court has reviewed both the photographs and the videotape. Most of the photographs depict defendant's substation on dates ranging from January 4, 1998 to approximately July 1998. Two were stamped with the date of February 22, 1999. The undated photographs appear to have been taken around the same period. The videotape, also showing the dates on which the views were taken, portrays the substation on approximately 29 different occasions from December 29, 1997 to June

---

7. Mancuso's claim that he has established injury in fact by asserting a "sincere and deeply felt offense" to the pollution in Echo Bay and by his current membership in certain environmental groups, is without merit. *Morton* established that "a party seeking review must allege facts showing that he is himself adversely affected" by the pollution. 405 U.S. at 740, 92 S.Ct. at 1368.

Mancuso's claim that the money expended in litigation of this case also constitutes injury in fact, is equally without merit. The Supreme Court has specifically stated that " '[a]n interest in attorney's fees is ... insufficient to create an Article III case or controversy where none exists on the merits of the

underlying claim.' " *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 107, 118 S.Ct. 1003, 1019, 140 L.Ed.2d 210 (1998) (quoting *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 480, 110 S.Ct. 1249, 1255, 108 L.Ed.2d 400 (1990)). "The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself." *Citizens for a Better Environment,* 523 U.S. at 107, 118 S.Ct. at 1019.

8. Of the 118 photos submitted to the Court, 104 were pictures of the substation and surrounding area, and 14 photographs were pictures of plaintiff and his family.

6, 1998 and once again on November 1, 1999.

The pictures do not show Mancuso or any members of his family at the substation but were assertedly taken by him. Defendant does not object to the admissibility of the photographs and videotapes or assert that they were taken by someone other than Mancuso. Considering this evidence in the light most favorable to plaintiffs, it establishes that Mancuso visited the area of the substation on a number of days other than May 8, 1998 and January 11, 2000.

█ The management of discovery lies within the sound discretion of the district court; its discovery rulings will not be reversed absent an abuse of discretion. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 561 (2d Cir.1997). We have already expressed our concern in this case that Mancuso's "sworn testimony has shifted dramatically to suit plaintiffs' evolving litigation strategy." *Mancuso,* 905 F.Supp. at 1259 n. 9. However, there is credible evidence that Mancuso visited the area in question on a number of days other than May 8, 1998 and January 11, 2000.

The Court therefore finds that Mancuso has at the least created an issue of fact as to whether he was mistaken when he initially answered the interrogatories, and will allow his amended answers to stand.

### ii. *Affidavit*

█ It is well settled that the statements in an affidavit or affirmation opposing a motion for summary judgment must be accepted as true. *See Lujan,* 504 U.S. at 561–62, 112 S.Ct. at 2137. However, it is also well settled that one cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts," *Western World Ins. Co., v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (citations omitted), and may not submit self-serving affirmations that contradict prior testimony asserted in depositions, interrogatories, and affidavits. *See Reisner v. General Motors Corp.,* 671

F.2d 91, 93 (2d Cir.1982), *Mazzuocola v. Thunderbird Prods. Corp.,* No. 90–CV–0405, 1995 WL 311397, at *9 (E.D.N.Y. May 16, 1995) ("[f]actual assertions made in an affidavit submitted in opposition to a motion for summary judgment may be disregarded if those assertions are contradicted by statements in response to interrogatories").

Defendant's attack on Mancuso's affidavit is primarily based on the premise that it avers that Mancuso took photographs and videotapes of the property every week for three years. We do not read the affidavit in that way. It contains two separate statements by Mancuso: (1) that he visited the property every week for three years; and (2) that on 29 occasions between January 1998 and February 1999 he took photographs of the substation as well as videotapes. As stated above, there is evidence that corroborates the second statement; there are photographs with the dates of January 1998 and February 1999 and the videotape depicts approximately 29 different days of taping of defendant's substation. Although the first statement seems improbable, there is no evidence which contradicts it. The affidavit will not be excluded. Therefore, the Court concludes that, at least for the purpose of deciding the present motion, the requirement of injury in fact has been satisfied.

### B. *Causal Connection*

█ With respect to the second requirement of a causal connection between the injury and the complained of conduct, there is no need to prove with scientific certainty that defendant's actions caused the harm suffered by plaintiff. Indeed, Courts of Appeals have refused to equate the "fairly traceable" requirement of standing to that of tort causation. *Gaston Copper Recycling Corp.,* 204 F.3d at 161. Thus, the question of whether plaintiffs have alleged an injury in fact that is fairly traceable to alleged violative conduct is one which is distinct from that of whether plaintiffs have a meritorious claim. *See*

*Lerman v. Board of Elections in the City of N.Y.*, 232 F.3d 135, 143 n. 9 (2d Cir. 2000). The present issue is whether the alleged injury can be fairly traced to the conduct of defendant and not that of some non-party. *See Lujan*, 504 U.S. at 560, 112 S.Ct. at 2130.

Because PCBs are, at least in the concentrations involved here, colorless and odorless, Mancuso could not have directly detected their presence in Echo Bay on his drives past the area. Instead, he claims that he has been offended by the sight of "deformed and tumored animals in the waters of Echo Bay," allegedly the victims of PCBs. If he did see dead or maimed animals, it is surprising that in all of his trips to obtain photographic evidence, he never took pictures of them. Moreover, it is by no means clear that any such damage was caused by PCBs. As discussed hereinafter, the water in the Bay and the soil beneath and around it have been repeatedly tested and the PCB concentration was found to be below environmentally acceptable levels.

It appears equally, if not more likely, that any killing or maiming of animals was caused by the other types of pollutants in the Bay, such as oil or raw sewage, with its unspeakable flotsam, which formed the basis of plaintiffs' lawsuit against the New York Thruway Authority (the "Thruway Authority"). *See Mancuso*, 56 F.Supp.2d at 393–94. However, for purposes of this summary judgment motion only, this Court finds that there is at least an issue of fact as to whether at some time Mancuso has seen at Echo Bay dead or maimed animals whose death or maiming was caused by PCB pollution, and that the requirement of causal connection is therefore satisfied.

**C. *Redressability***

■ At the present time, there appears to be no remedy this Court might grant in

this action which would significantly improve conditions at Echo Bay so that plaintiffs' CWA claim is, for all practical purposes, moot.

■ Citizen suits may be brought under the CWA only to prevent threatened future violations and not to remedy wholly past violations. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64, 108 S.Ct. 376, 385, 98 L.Ed.2d 306 (1987). The critical time for determining whether there is an ongoing violation is when the complaint is filed. *See Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1311 (2d Cir.1993). Therefore, in order to establish a claim under the CWA, the plaintiff must allege, in good faith, a violation which was continuing as of 1993, when the action was brought. *See Gwaltney*, 484 U.S. at 64, 108 S.Ct. at 385.

The doctrine of mootness prevents the continuation of a lawsuit when "there is no reasonable expectation that the wrong will be repeated.'" *Id.* at 66, 108 S.Ct. at 386 (citations omitted). It protects defendants from CWA suits grounded only upon discontinued violations while allowing suits against defendants who seek to evade the consequences of their actions by mere "protestations of repentance and reform." *Id.* at 67, 108 S.Ct. at 386 (quoting *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1952)). Thus, an action will not be dismissed as moot, unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney*, 484 U.S. at 66, 108 S.Ct. at 386 (citations omitted). In the instant case, there is no reasonable likelihood of significant future pollution of Echo Bay by PCBs from defendant's substation.[9]

Defendant abandoned the substation 20 years ago, in 1981, and has done nothing

**9.** Mancuso argues that defendant's pollution of Echo Bay falls within an exception to mootness, namely conduct "capable of repetition, yet evading review." *Laidlaw*, 528 U.S. at 170, 120 S.Ct. at 699 (citations omitted). However, he has presented no evidence of a likelihood of future PCB pollution by defendant.

there since except to pursue a series of cleanup operations. On June 15, 1992, six months before this action was filed, defendant entered into a Consent Order with the DEC, *see Mancuso,* 967 F.Supp. at 1439 n. 1, in which the DEC ordered the soil at the substation cleaned to a level of 1 ppm, while allowing levels of up to 5 ppm in the sediment beneath the Bay. *See Mancuso,* 56 F.Supp.2d at 400. These levels are much more stringent than those set by the Environmental Protection Agency ("EPA") which permits PCB levels of 50 ppm in industrial areas and 10 ppm in residential areas. *See id.* (citing 40 C.F.R. § 761.125(c)(2)(ii)).

Defendant worked "under the watchful eye of the [DEC]" for many years. *Mancuso,* 967 F.Supp. at 1439. The cleanup was effective. In 1998, under DEC supervision, defendant tested 150 samples of Echo Bay sediment adjacent to the pipes that Mancuso claims discharges PCBs into Echo Bay. (Giglio Aff., Ex. D.) Only one of these 150 samples was above the DEC target level of 5 ppm. This was followed by further cleanup under DEC supervision. (*Id.*) On January 11, 2000, Mancuso met with the DEC and the EPA in an effort to convince them to require defendant to test other areas in Echo Bay for PCBs. However, neither agency has required defendant to perform any further testing in the Bay since the time of this meeting. (Giglio Aff., Ex. D.)

Mancuso's contention that Echo Bay is still contaminated by PCBs is based upon tests of soil samples taken several years ago at defendant's substation and areas adjacent thereto, not at the Bay, and upon clearly erroneous assumptions as to acceptable PCB levels. Mancuso claims that the acceptable limit for chronic exposure through drinking water and fish ingestion is 79 pg/l, the equivalent of 0.000000079 ppm, and that acute toxicity is estimated to occur above 2 ppb, the equivalent of .002 ppm, but he cites no evidence therefor. (Webber Aff. at 9.) There is considerable evidence to the contrary. In 1997, this

Court noted that "the [U.S.] Food and Drug Administration ('FDA') allows fish with 2 ppm PCBs to be sold for human consumption and food sold for human consumption to be wrapped in paper containing PCB levels of 10 ppm." *Mancuso,* 967 F.Supp. at 1440 (citing 21 C.F.R. § 109.30(a)(7)). In 1999, this Court found that from February to April 1993, Matrix Environmental Management tested nine samples taken from various areas of the marina: 4 samples had no detectable levels of PCBs while the other five all had levels below .25 ppm. *See Mancuso,* 56 F.Supp.2d at 400. This Court further found that:

> the levels of PCBs, even in the mud flat and in the sediment of the marina, where the highest concentrations would be expected because of the affinity of PCBs for highly organic matter, are generally much lower than those that are deemed to create no unacceptable health risks even to persons in intimate contact with the soil.

*Id.* at 400–01.

Mancuso nevertheless claims that there is a continuing discharge of PCBs from Con Ed's substation into the Bay as water and liquids pass through allegedly contaminated drain pipes, tunnels, conduits and cable ducts, but there is no substantive evidence to support that claim. (Webber Aff. at 5.) He further claims that a recently discovered underground well has been discharging PCBs into the water. (Pl. Cert. & Summ. Doc. Evid., Ex. 9.) However, Mancuso submits no credible evidence of the existence of such a well, and defendant categorically denies it. (Skorobogatov Reply Cert. ¶ 5.) Indeed, after Mancuso asserted the existence of the well, defendant excavated the suspected area and found no remains or other evidence of a well. (*Id.*)

The soil samples on which Mancuso relies were taken in the years 1995, 1996, and 1998 from areas adjacent to the substation. (Pl. Cert. & Summ. Doc. Evid., Exs. 10, 12, 19, 24, 26.) The level of PCBs in these samples was remarkably low. Of

the 95 samples taken of the mud flat sediment and various drain pipes, 48 had PCB levels less than 1 ppm, and only 4 had levels greater than 10 ppm. (*Id.*, Ex 19.) Furthermore, it appears that the samples were taken prior to the latest cleanup in that area. (Skorobogatov Reply Cert. ¶ 4.)

Plaintiffs have also submitted an affidavit of Dr. Webber who avers that "[i]t can be stated with reasonable scientific certainty that PCB migration from the site into Echo Bay occurred in the past ... and will continue to do so as long as there are sources of PCBs on the site." (Webber Aff. at 6.) However, that conclusory and non-quantitative opinion can only be considered as conjecture because Dr. Webber cites no recent evidence of PCB contamination of the Bay.

Plaintiffs' hypothesis that PCBs are being discharged into the Bay as water passes through contaminated pipes is based in part on the fact that in 1998 defendant began filtering the water "with an oil/water separator, passed through two dual-cell bag filters and then polished by an activated carbon filter." (Pl. Cert. & Summ. Doc. Evid., Exs. 11, 20.) Mancuso claims that this supports his theory that prior to this filtering, defendant was discharging contaminated water into the Bay. (Pl. Mem. Opp. Mot. Summ. J. at 13.; Pl. Cert. & Summ. Doc. Evid., Exs. 20, 30.) However, the evidence is directly contradicted by a letter written by defendant in 1995, stating that 100,000 gallons of water had to be transferred from the basement of the substation into Echo Bay and that, in two samples taken, no PCBs were detected. (Pl. Cert. & Summ. Doc. Evid., Ex. 30.)

In further support of this claim, Mancuso submits the analysis of a sample extracted from a water drain in the vicinity of the old north wall of the substation showing a PCB level of 23 ppm which he claims exceeds the acceptable level by 80,-000%. (*Id.*, Ex. 8.) However, this drain was subsequently removed and the surrounding soil was tested, showing no contamination. (Skorobogatov Reply Cert. ¶ 3.) Defendant's position is bolstered by the fact that of the 37 samples taken, only two exceeded the cleanup criteria for the 0–2 foot depth interval. (Pl. Cert. & Summ. Doc. Evid., Ex. 8.)

Finally, Mancuso submits a letter written in 1997, from the New York District Corps of Engineers who had received a request for the Department of the Army to remove PCBs in excess of 5 ppm in Echo Bay. It discussed a permit to be issued in connection with vacuum excavation during low tide of an area 17 feet wide by 23 feet long by 1 foot deep. (*Id.*, Ex. 21.) However, it does not state by whom the request was made and Mancuso does not disclose any basis for believing that the PCB level was actually above 5 ppm. Plaintiff does not state whether the removal was actually accomplished. But if it was, it presumably occurred more than 3 years ago.

In sum, whether or not defendant's efforts to clean up the substation and adjacent areas were reluctant and dilatory, there is no evidence to support the claim that the Bay is presently contaminated. (Pl. Mem. Opp. Summ. J. at 13–14; Pl. Cert. & Summ. Doc. Evid., Exs. 22, 29, 31, 33–35, 37.) Indeed, one exhibit submitted by Mancuso flatly contradicts that claim. In a letter written by the DEC to Mancuso in 1995 it states:

> The 3 ppb in surface waters of Echo Bay that you refer to was found in the 1984 sampling. The Bay water was sampled again during the 1992 Phase II investigation, buit [sic] no PCBs were detected. As you know, the Phase II investigation was conducted to determine if prior site clean up was sufficient and whether any PCBs were being released from the site.

(Pl. Cert. & Summ. Doc. Evid., Ex. 28.)

We therefore conclude that Mancuso can show no substantial redressable injury and that plaintiffs' claim under the CWA is moot. There is no reasonable expectation of any future violation and no injury which

could be redressed except for the *de minimis* alleged past offense to Mancuso's aesthetic sensibility.

### CONCLUSION

As this Court has previously stated, it is acutely sympathetic with a man who, in admirable pursuit of the American Dream of being his own boss, buys a marina and toils valiantly to build a profitable business, only to have his dream turned into a nightmare by noxious and toxic discharges into his boat basin from an adjoining oil storage facility, a highway storm drain illegally tapped for raw sewage disposal, and by an adjoining power substation on which a fire six years earlier had caused spillage of transformer oil containing PCBs, which are recognized carcinogens. But the Mancusos' most promising bid for relief from that catastrophic injury, their action against the Thruway Authority, resulted in a verdict for the defendant, presumably because the jury found that the Thruway Authority was not responsible for the unauthorized and perhaps unknown use of its drain by others for the discharge of sewage and other pollutants.

Thus the Mancusos' only remaining hope for compensation is this action against the owner of the substation. But their claims for both personal injury and property damage have been dismissed and the dismissal of those claims has been affirmed on appeal. This leaves only Mancuso's citizen-suit claim under the CWA. But more than a decade before this action was filed, defendant had abandoned the substation property and discontinued all operations at the site which could have resulted in further pollution of Echo Bay. Just the contrary, under compulsion from the State DEC, and under their supervision, defendant had already commenced an extensive and expensive cleanup of the area designed to remove any remaining PCBs which could create a hazard to humans or wildlife. That cleanup continued sporadically for many years until the DEC finally gave the area a clean bill of health.

These remedial actions were neither undertaken nor pursued to a satisfactory completion in response to plaintiffs' CWA claim. That claim thus has served no beneficial public purpose. Nor can it do so in the future. Defendant's cleanup of the area has been carried to the practical maximum. No conceivable order that this Court could enter would improve the environment, which is the underlying purpose of the CWA.

If the action went to trial, even if all of plaintiffs' evidence were believed, the monetary judgment which might reasonably be awarded to compensate a person who lives a two-hour drive away from Echo Bay for the alleged offense to his aesthetic senses during an occasional drive past the site would be nominal at best. The only practical purpose of the trial would thus be to obtain an award of attorneys fees. This is not a proper use of the CWA or of the limited facilities of the federal courts.

Defendant's motion for summary judgment is granted. Plaintiffs' CWA claim is dismissed with prejudice.

SO ORDERED.